**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| *In Re:*<br><br>*Americanas S.A., et al.,*<br><br>**Debtors in a Foreign Proceeding** | Case No. 23-10092 (MEW)<br><br>Chapter 15<br>(Jointly Administered) |

**DECLARATION OF ALEXANDRE FIDALGO PURSUANT TO 28 U.S.C. § 1746 IN SUPPORT OF THE MOTION OF SABLON PARTNERS LTD. FOR ENTRY OF AN ORDER PURSUANT TO BANKRUPTCY RULE 2004 AUTHORIZING THE EXAMINATION OF DEBTORS AMERICANAS AND B2W DIGITAL AND THIRD PARTIES**

I, Alexandre Fidalgo, pursuant to 28 U.S.C. § 1746, hereby declare under penalty of perjury under the laws of the United States that the following is true and correct:

1. I submit this declaration (the "**Declaration**") in support of Empresa Sablon's Motion for Entry of an Order Pursuant to Bankruptcy Rule 2004 Authorizing the Examination of Debtors Americanas and B2W Digital and Third Parties (the "**Rule 2004 Motion**").

**BACKGROUND AND QUALIFICATIONS**

2. I am a Brazilian citizen, attorney licensed to practice in Brazil, and a member in good standing of the Brazilian Bar Association under no. OAB/SP 172.650, since 2000, and under no. OAB/DF 74.523 (supplementary).

3. I hold a Bachelor of Law Degree from the United Metropolitan Universities of São Paulo (*Faculdades Metropolitanas Unidas – FMU*), which I received in 1998; a Master of Law Degree in Civil Procedure Law from the São Paulo's Catholic University (*Pontifícia Universidade Católica de São Paulo - PUC-SP*), which I received in 2013, and a Doctorate

1

Degree in Constitutional Law from the São Paulo State University (*Universidade de São Paulo – USP*), which I received in 2022.

4.      In 2016, I founded the law firm Fidalgo Advogados. My professional experience focuses on advisory and litigation in various areas, such as corporate litigation, electoral, criminal cases and civil demands, with remarkable actuation on Superior Courts.

5.      I am a member of the Superior Council of Law Issues (CONJUR) of São Paulo's Federation of Industries (FIESP 2022/2023) and also of the Liberties' Rights Defense Committee of the Federal Consuel of the Brazilian Bar Association. I am also a writer for the website Law Consultant (*Consultor Jurídico*), in which I write about themes regarding the Right of Liberty of Expression.

6.      My firm and I represent Sablon Partners Ltd. in a Brazilian discovery proceeding against Americanas S.A., filed before the lower corporate court of the state of São Paulo.

7.      I submit this Declaration to assist this Court in its consideration of Empresa Sablon's motion for an entry of order pursuant to Bankruptcy Rule 2004 ("**Rule 2004 Motion**").

8.      Although Portuguese is my native language, I am fluent in English and have elected to execute and submit this Declaration in English.

9.      The facts and matters contained in this Declaration are true and correct to the best of my information, knowledge, and belief. To the extent matters stated in this Declaration are statements of legal opinion, such statements represent my views as a practicing Brazilian attorney.

10.     In preparing this Declaration, I have reviewed the Petitioner's Declaration and Verified Petition for Recognition of the Brazilian RJ Proceeding and Motion for Order Granting Related Relief Pursuant to 11 U.S.C. §§ 105(A), 1509, 1515, 1517, 1520, and 1521,

2

Dkt. No. 3, dated January 25, 2023 (the "**Petition**"), and the Declaration of Francisco Satiro Pursuant to 28 U.S.C. § 1746 in Support of the Petitioner's Declaration and Verified Petition for Recognition of the Brazilian RJ Proceeding and Motion for Order Granting Related Relief Pursuant to 11 U.S.C. §§ 105 (A), 1509, 1515, 1517, 1520, and 1521, Dkt. No. 4, dated January 25, 2023 (the "**Satiro Declaration**"). Capitalized terms not otherwise defined herein have the definitions used in the Petition and the Satiro Declaration.

### THE BRAZILIAN JUDICIAL REESTRUCTURING PROCEEDING

11. Under Brazilian law, the judicial restructuring is a process similar to the restructuring aspect of Chapter 11 of the United States Bankruptcy Code. It aims to provide the debtor with the means to overcome its economic and financial concern in order to keep the business, jobs and to protect the interests of the creditors. Therefore, the main objective of the judicial restructuring proceeding is to promote the maintenance of the enterprise, its social function and stimulating economic activity.

12. The judicial restructuring should, consequently, be defined precisely on the basis of this purpose of encouraging the cooperation of all creditors in order to overcome the debtor's economic and financial crisis. It is intended to allow the debtor to renegotiate its debts with its creditors in a structured environment.

13. Under Brazilian Law, the shareholders of the debtor have no right to vote or even participate directly in the judicial restructuring. However, they are allowed to elect the officers and/or managers of the debtor, who then have the duty of preparing the judicial restructuring plan and negotiating it with the creditors.

14. When talking about judicial restructuring proceeding, creditors usually have the greatest interest in the preservation of the company.

3

15. Reading Satiro's Declaration, I agree when Mr. Satiro states that creditors in Brazil may, but "rarely" do, seek the formation of a creditor's committee, similar to the committees in the United States:

> The Brazilian Bankruptcy Law also allows creditors to form a committee composed of up to one 1t; representative from each of the determined class of creditors (as explained below). The creditors' committee serves as an overseeing body that ensures the interests of the creditors are represented throughout the proceeding. The main responsibilities of the creditors' committee are to inspect and monitor compliance with the Brazilian Bankruptcy Law, to inform the judge of any violation of legal provisions by the debtor, to request that the judge call a General Creditors' Meeting (as defined below), and to issue opinions on proofs of claims. In practice, creditors rarely seek the formation of a creditors' committee. (Satiro's Declaration, § 23).

16. No such committee has been formed in Americanas S.A.'s Brazilian Bankruptcy cases.

**AMERICANAS'S CURRENT CORPORATE GOVERNANCE**

17. Brazilian corporation Americanas S.A. ("**Americanas**") was formed in 2021 via the merger of Lojas Americanas S.A. ("**LASA**"), which encompassed Americanas's brick and mortar business, and B2W Digital, which encompassed Americanas's e-commerce business. As Americanas explains in the petition, after the 2021 merger, B2W Digital "became a holding company with no actual business." Both Americanas and B2W Digital are Chapter 15 Debtors.

18. Americanas's corporate governance structure is nowadays composed of: (a) a seven-member Board of Directors; (b) advisory committees, which have internal regulations that govern their activities and existence; and (c) an Audit Committee. Exhibit A at 18.

19. Americanas is a publicly listed company controlled by a group of three shareholders, commonly referred to as the "Reference Shareholders," who currently hold 30.12% of Americanas's shares. They are Jorge Paulo Lemann, Marcel Hermann Telles and Carlos Alberto da Veiga Sicupira. Dkt. No. 3-4 at 145.

4

20. According to some of the documents submitted by the judicial administrator, those three hold those shares directly (as is the case for Carlos Alberto da Veiga Sicupira) or indirectly via other companies, such as Cedar Trade LLC, BRC S.a.R.L, Cathos Holding, S-Velame S.a.R.L. Exhibit A at 9-10. The Reference Shareholders control a large number of corporations in Brazil and worldwide.

21. Of the seven members of Americanas's Board of Directors, three are known as the "independent" members, nominated in accordance with the Brazilian Listing Regulation for the companies listed in the "New Market" in B3, a stock exchange located in São Paulo, and four are chosen by the Reference Shareholders. The judicial administrator in the RJ Proceedings has explained that the Reference Shareholders "have the power to influence or interfere with [Americanas's] decision-making, for example, by approving or determining its business strategy, choosing or dismissing the managers of the business." Exhibit A at 9.

## THE AMERICANAS FRAUD

22. As depicted in the Petition, Americanas's public financial distress started when it disclosed to the market it had identified accounting inconsistencies in its past financial statements estimated to approximate BRL 20 billion, or approximately US$3.8 billion (the "**Accounting Inconsistencies**"). See Dkt. No. 3, ¶ 4.

23. In response, on January 12, 2023, Americanas's Board of Directors appointed a so-called "independent" committee (the "**Board Committee**") "to investigate the circumstances that caused the inconsistencies in accounting entries identified by [Americanas]." Exhibit B. While the Board Committee has not yet concluded its mandate, Americanas has issued notices to the market confirming that the Accounting Inconsistencies are the result of a massive fraud perpetrated in Americanas's financial statements over several years.

24. For example, on June 13, 2023, Americanas notified the market that: (i) "[Americanas's] financial statements were being fraudulently altered by the previous board of officers of Americanas" (the "**Fraud**"); and (ii) the Fraud was committed by, and among other things, manufacturing false advertising agreements and executing financing agreements without the required corporate approvals, which were then inappropriately recorded in Americanas's financial statements. Exhibit J. The Fraud: (a) increased Americanas's results over time by approximately BRL 25.3 billion, approx. US$4.9 billion[1]; and (b) reduced Americanas's gross financial debt by approximately BRL 20.6 billion, US$4 billion[2]. Exhibit L. Americanas preliminarily indicated that the following participated in the Fraud: (i) its former CEO Miguel Guiterrez, (ii) former officers Anna Christina Ramos Saicali, Jose Timotheo de Barros, and Marcio Cruz Meirelles, and (iii) former executives Fabio de Silva Abrate, Flavia Carneiro, and Marcelo da Silva Nunes (the "**Fraud Participants**"). Exhibit J.

25. Over the past 10 years (as the Fraud was ongoing): (i) Americanas's shareholders received a total of BRL 1.8 billion, US$349 million[3], in dividends (of which over BRL 330 million was paid in 2022 alone) (Exhibit D); and (ii) its officers received over BRL 700 million, US$136 million,[4] in compensation, including in bonuses based on the company's financial performance as reflected in the fraudulent financial statements. Exhibit C. Meanwhile, between August and October 2022, a few months before the Fraud was disclosed publicly, Americanas's officers sold BRL 241 million, US$46.7 million[5], in Americanas shares. Exhibit E.

**ONGOING INVESTIGATIONS AND CREDITOR CONCERNS ABOUT THEIR MISMATCHING**

**Creditor's Concerns Related to the Board Committee's Investigation**

---

[1] Exchange rate in force as of October 5, 2023
[2] Exchange rate in force as of October 5, 2023
[3] Exchange rate in force as of October 5, 2023
[4] Exchange rate in force as of October 5, 2023
[5] Exchange rate in force as of October 5, 2023

26. As already explained in this Declaration, on January 12, 2023, Americana's Board of Directors established the Board Committee to investigate "the circumstances that caused" the Accounting Inconsistencies, including the Fraud.

27. In doing so, the Board of Directors appointed the Committee's three members, defined the Committee's limited investigation mandate, and required the Committee solely to report to the Board. Due to that limited scope (as the Committee's mandate solely focuses on the circumstances that led to the Accounting Inconsistencies), it is not clear whether the Board Committee is investigating the Board members' potential involvement in the Fraud or just the potential involvement and/or liability of Americanas's senior officers. Since the Reference Shareholders, who control the Board, received significant dividends due to the Fraud, all the Board members as well as the members of the Board Committee have actual or at least potential conflicts of interest regarding any Fraud investigation. To say the least, the Board Committee lacks the appearance of being unbiased.

28. Although such concerns and despite the Board Committee is currently the only non-governmental party investigating the Fraud, its investigation is not supervised by a court or any representative of Americanas's creditors. Meanwhile, those creditors have been precluded from conducting their own investigation and/or monitoring the Board Committee's work due primarily to lack of access to relevant information.

29. First, the Board Committee does not communicate its findings to the market or to Americanas's creditors. Instead, it reports solely to the Board of Directors and its attorneys. In fact, on July 27, 2023, the Board Committee confirmed it would not release the results of its work to the public: "[a]s it is an advisory committee of the Board of Directors, the [Board] Committee reports its works to that body." Exhibit F at 3.

30. Once the Board Committee concludes its investigation, there will be no presentation of a final report to the creditors, nor will the evidence found, and any individuals

7

involved in the fraud, be disclosed. Since it is an investigation ordered by the Board of Directors, once the work is completed, a final report—which may or may not be written—will be presented by the Committee to the Board of Directors, which will then decide what to do with it: whether to implement any suggestions made by the Board Committee, and above all, whether or not to disclose the findings whether in part or in their entirety.

31. Second, the Board Committee has not granted creditors access to the evidence the Committee reviews. The Board Committee has noted that, to date: (i) it collected and preserved "about 200 Terabytes of data" from Americanas; (ii) it "received information from other sources;" and (iii) it is "conducting interviews with employees and former employees of [Americanas] to better clarify the facts, as well as the processes and procedures adopted by [Americanas]." Exhibit F at 2.

32. Equally problematic, in contrast to its refusal to share the gathered evidence with Americanas's creditors and other stakeholders, the Board Committee has disclosed such evidence to the Board of Directors, the controlling Reference Shareholders and their counsel. In fact, on June 13, 2023, attorneys for the Board of Directors presented to the same Board, and later to the public, a report based on the Committee's evidence (the "**Board Legal Report**"). Exhibits J and K. In the Board Legal Report, the Board's counsel, while acknowledging receipt of over 600 documents from the Committee, purports to exempt all the members of the Board of Directors from any liability or responsibility for the Fraud supposedly based on a handful of documents of which only quoted excerpts were provided.

**Other Stakeholder's Concerns About the Board Committee's Investigation and the Reference Shareholders' Knowledge of the Americanas Fraud**

33. In addition to the creditors, other Americanas's stakeholders have questioned the work of the Board Committee and the Board Legal Report. Lately, for example, Americanas's former CEO until December 2022, Miguel Gutierrez, who Americanas named as one of the Fraud Perpetrators, publicly voiced his concerns and vehemently challenged the

8

Board Legal Report conclusions. Exhibit G. Amongst his concerns, Mr. Gutierrez says that he too had asked for the Board Legal Report and the underlying documents but was denied access. After, he explained that before becoming Americanas's CEO, he was the CEO of LASA, which was a financially healthy company until 2021 when it was merged with B2W Digital, which was not financially healthy, to form Americanas. Exhibit G and Exhibit H. He indicates that Americanas's financial problems stem from B2W, not LASA, and that therefore he had no involvement in the Fraud. Exhibit H. Lastly, Mr. Gutierrez clarifies that the Reference Shareholders actively participated in the financial management of the company either by giving orders themselves or via orders from the officers of their holding company, LTS.

34. The partner at KPMG, Ms. Carla Bellangero, who was responsible for auditing Americanas until she and her firm were fired, has also publicly stated her belief that the Board of Directors was aware of the Fraud since at least 2019. Exhibit I.

35. In a government-led investigation, which will be discussed below, Ms. Bellangero testified that in 2019 KPMG notified Americanas that it had identified "deficiencies" in the company's advertising agreements, but that, in response, Americanas terminated its agreement with KPMG mid-audit, six days after receiving such notice. Exhibit I.

**IN PROGRESS GOVERNMENTAL INVESTIGATIONS BY THE CVM AND THE BRAZIL'S PARLIAMENT – LIMITATION AND LACK OF PROTECTION OF THE CREDITORS**

36. Until recently, there were two government-sponsored Fraud investigations happening in Brazil—one conducted by the CVM (Comissão de Valores Imobiliários – Brazil's SEC), known as the "CVM Investigation" and another one, conducted by Brazil's Congress, known as the "CPI Investigation." The first one is still ongoing, but the CPI investigation was recently ended, without achieving any conclusions.

9

37. Neither of the investigations, however, considers the civil liability of any individuals implicated in the Fraud, nor do they seek means to restore the Company's assets for the purpose of settling its outstanding obligations with creditors. These investigations are aimed at ascertaining potential criminal and regulatory implications related to the Fraud, which means none of them were oriented towards creditor concerns such as seeking recoveries to help replenish the Debtor's estates and repay creditors.

**The CVM Investigation**

38. The CVM is responsible for regulating Brazil's capital markets and the market participants. As Americanas's stock is traded on B3, a stock exchange located in São Paulo that is regulated by the CVM, the CVM has started a series of investigations that, directly or indirectly, deal with the Fraud. However, none of them seek to determine the responsibility of the members of the Board of Directors or Reference Shareholders for the fraud, nor do they aim to facilitate the Company's asset recovery or promote measures for that purpose. This is because the spectrum of the CVM's jurisdiction is limited to the Brazilian securities market (pursuant to Act No. 6,385/76). The investigations carried out by the CVM focus on Americanas itself as a publicly held company and the officers of Americanas who committed specific acts while representing the company. In these proceedings, individuals found guilty of any of the irregularities being investigated may, at most, face the typical sanctions imposed by the CVM as set forth in Law No. 6.385/76, such as a warning or a fine, for example. Nonetheless, they cannot be held civilly liable or be compelled to compensate the company or its creditors. In addition to that, most of the documents that are submitted in the proceedings initiated by the CVM are confidential.

**The CPI Investigation**

39. The Brazilian Parliamentary Inquiry Commission ("**CPI**") is an instrument of Brazilian Legislative branch to investigate, within the limits imposed by the law, cases

10

considered significant for the public interest, such as the Americanas case. However, even though the CPI has broad investigative powers (pursuant to Article 58, §2º, of the Brazilian Federal Constitution), it does not have the authority to judge the facts uncovered. Generally, a CPI has a limited mandate that, if not renewed, ends in 120 days. Upon expiration of the mandate, the CPI will produce a specific report containing its findings, and if its members deem it appropriate, they may recommend that the Brazilian Public Prosecutor's Office take the necessary measures to identify and punish those responsible for any wrongdoing uncovered.

40. Even though the Americanas CPI was able to bring to light some interesting and helpful testimony and declarations, its limited mandate was not enough to protect Americana's creditors.

41. The Americanas CPI's mandate expired on September 26 with the issuance of a final, unconclusive report. In the report, the CPI members noted that, although the collected evidence lead to a possible involvement of Americanas's former officers and directors' in the Fraud, the CPI did not collect enough information and elements to support an indictment.

**The Brazilian RJ Investigation**

42. On February 9, 2023, the judge overseeing Americanas's RJ Proceeding (called the "**RJ Judge**") ordered an investigation into the "accounting inconsistencies" that had led to Americanas's RJ Proceeding (the "**RJ Investigation**").

43. Significantly, such investigations are unusual before a bankruptcy court in Brazil. Brazilian Bankruptcy law does not provide for evidence production in a RJ Proceeding and any claims seeking recoveries from third parties to supplement the debtor's estate would not be brought before the RJ Judge.

44. Such as the other investigations, the RJ Investigation was not started to address creditor concerns or identify who might be responsible for the Fraud, but rather to address

11

uncertainty at that time regarding the impact of the Fraud on the survival of Americanas's business and ascertain Americanas's true financial situation. Exhibit A. In other words, the RJ Investigation was intended to make up for the lack of reliable information about the real economic and financial situation of Americanas, so that the creditors, who decide the course of the company's recovery process, could make informed decisions when voting on the RJ plan. Once he determined that Americanas's business had stabilized enough, the RJ Judge closed the RJ Investigation by order dated August 18, 2023. Exhibit A.

45. Notably, the RJ Judge's August 18 opinion stated that "incidental or secondary" issues may and should be pursued outside the RJ Proceeding. By "incidental or secondary," the RJ Judge was likely referring to investigations and actions concerning the Fraud itself and related recoupment actions.

### THE RULE 2004 DISCOVERY SABLON PARTNERS LTD. NOW SEEKS

46. Sablon Partners Ltd. seeks evidence in the United States to provide more information for the creditors that are currently negotiating a restructuring plan with Americanas and help them to understand if the current administration is taking all actions needed in order to safeguard Americanas' assets and ongoing business. The evidence found will help inform the creditor's decisions: whether to agree or not agree to the restructuring terms Americanas is proposing, and whether to pursue other possible actions in the RJ Court, such as proposing an alternative plan or seeking the removal of officers and or directors underto the Brazilian Bankruptcy Code. This evidence includes:

47. Evidence from Debtor B2W Digital. As discussed in paragraph 33 above, Americanas's former CEO's declaration gives Sablon Partners Ltd. reasons to believe that the Fraud started in Debtor B2W Digital's financial statements. Further, Exhibit D of the Petition shows that in November 2020 B2W Digital issued the United States' qualified institutional buyers (as defined by Rule 144A) in compliance with Rule 144A and to non-U.S. persons

12

bonds called the B2W Digital Notes, raising U.S. 500,000,000 in capital, which issuance was in all likelihood based on fraudulent financial statements and balance sheets. Sablon Partners Ltd. seeks evidence from B2W Digital and the individuals involved in the issuance of the B2W Digital Notes.

48. <u>Evidence from Debtor Americanas</u>. Sablon seeks evidence concerning Americanas's current shareholders, as well as historical information regarding the payment of dividends from both Americanas and B2W Digital to companies located in the United States, in order to trace payments based on the Fraud. From reviewing the B2W Digital Notes, it is my understanding that Americanas's shares are held in part by companies located in the U.S., including LTS Trading Company LLC, Cedar Trade LLC, Cathos Holding LLC, and Invesco Ltd. Dkt. No. 3-4 at 29.

49. Evidence from the LTS companies. As discussed in paragraph 33 above, Americanas's former CEO alleges that the Reference Shareholders actively participated in the financial management of Americanas and B2W Digital via orders they gave to officers of their holding company, "LTS." Although Mr. Gutierrez does not specify which LTS company he is referring to, the companies in the LTS group—*e.g.*, LTS Investment Holdings, LLC, LTS Investments, Inc., and LTS Trading Company LLC—are all registered in the state of Delaware. Exhibit M.

50. Evidence from Cedar Trade LLC. As discussed in paragraphs 20 and 21 above, the Reference Shareholders hold their shares in Americanas via offshore companies, including a Delaware LLC—Cedar Trade LLC. Sablon Partners Ltd. seeks discovery from Cedar Trade LLC regarding the dividends it received from Americanas, LASA, or B2W Digital, as well as Cedar Trade LLC's participation in the management of Americanas and B2W Digital, including those companies financial statements.

**POTENTIAL ACTIONS AVAILABLE TO CREDITORS IN BRAZIL**

13

51. Receiving the information now sought in the Rule 2004 Motion is essential to creditor efforts to: (a) evaluate the Board Committee's investigation; (b) determine whether there are potential avoidance and/or other actions against the officers, directors, or shareholders of Americanas to recoup massive payments improperly made based solely on the Americanas Fraud and if appropriate, to pursue such remedies; and (c) ultimately to evaluate Americanas's debt restructuring plan. Obtaining such information now is particularly important as neither Americanas nor the Board Committee have sought or made any efforts to recoup fraudulent or other improper transfers or other payments based on the Americanas Fraud. Nor have they provided Sablon Partners Ltd. or Americanas's other creditors with the information needed to creditor performing independent investigations and, if appropriate, bringing such actions themselves.

52. Moreover, such creditor efforts are encouraged by and consistent with Brazilian bankruptcy law. Under Brazilian law, actions for recoupment of a debtor's assets are normally not centralized in, or stayed due to, a RJ Proceeding and may be brought in parallel with it. Further, under Brazilian law, creditors have standing to bring a variety of actions to recoup a debtor's assets. In this respect, I agree with Mr. Satiro's explanation that in Brazil, creditors are generally permitted to bring actions to avoid transfers or transactions that are considered fraud against creditors, including: "(i) a gratuitous transfer of assets that leads to or occurs during the debtor's insolvency; or (ii) any onerous transactions entered into by an insolvent debtor and a third party for fraudulent purposes, if causing damage to the creditors." (Dkt. No. 4, ¶¶ 45-47).

53. Brazilian law also allows creditors to bring the following actions, which may be brought directly against a company's shareholders and/or administrators in a forum independent from the RJ proceeding:

14

(I) <u>Piercing the Corporate Veil.</u> Article 50 of the Brazilian Civil Code authorizes a creditor to seek to pierce the corporate veil of a corporation upon a showing that shareholders or administrators abused the corporation's legal separation to harm creditors.

(II) <u>Recouping Losses from Controlling Shareholders.</u> Article 117 of the Brazilian Corporations Act allows a creditor to recoup losses from controlling shareholders when those losses are caused by the controlling shareholders' abuse of power. Examples of abuse are listed in Article 117 and include: (i) leading the company towards a purpose foreign to the corporate purpose or harmful to the national interest, or leading it to favor another company, Brazilian or foreign, to the detriment of the minority shareholders' participation in the company's profits or assets, or the national economy; (ii) inducing, or attempting to induce, an administrator or supervisor to practice an illegal act or not comply with their duties defined in the Brazilian Corporate Law and the bylaws, and promote, against the company's interest, the ratification of the illegal conduct by the general meeting; and (iii) approving or having approved irregular accounts of administrators, for personal profit, or failing to investigate a complaint they know or should have known to be valid, or that justifies a well-founded suspicion of irregularity.

(III) <u>Recouping Losses from Managers and/or Administrators.</u> Article 159 of the Brazilian Corporations Act enables a harmed third-party, including a creditor, to recoup losses from a corporation's managers and/or administrators upon a showing that the culpable conduct of the manager (whether an action or inaction) caused the third-party's harm.

54. However, Sablon Partners Ltd., and other creditors, could only assess the viability of any such causes of action after receiving vital documents and other evidence sought in this motion.

## BRAZILIAN COURTS' DISCOVERY LIMITATIONS AND RECEPTIVITY TO EVIDENCE OBTAINED ABROAD

55. Brazilian courts lack authority under Brazilian law to order parties located outside Brazil to produce documents and testimony. In theory, Sablon Partners Ltd. could ask the Brazilian courts to issue letters rogatory, but that is not a viable option for Sablon Partners Ltd. here because the letters rogatory procedure is typically very slow.

56. Discovery was historically a concept foreign to Brazilian civil procedure, as each side is expected to support its case on the basis of evidence that is available to it. Courts would sometimes order a party to disclose a document, but that required the petitioner to identify specifically the evidence sought, which greatly limited any potential discovery.

57. Brazil only recently instituted discovery actions that are somewhat similar to U.S. discovery via the revision of Article 397 of the Brazilian Civil Procedure Code in August 2021. Under Article 397, litigants are now allowed to ask for categories of documents, instead of specifically identifying the document it seeks. Discovery in Brazil is thus a novel concept that still imposes significant difficulties on discovery petitioners. For example, (i) Americanas has been able to avoid producing documents in Brazil by creating procedural difficulties; (ii) the mechanisms available in the U.S. to ensure compliance with discovery orders (including sanctions, contempt, or counsel ethical duties) are absent; and (iii) the evidence obtained is not directly shared with the petitioner but rather analyzed by a court-appointed expert in a final report.

58. Despite the difficulties in obtaining evidence in Brazil, the RJ Court, or other courts in Brazil, would be receptive to evidence obtained in the United States through Rule 2004. Pursuant to Article 13 of the Law of Introduction to the Rules of Brazilian Law

("**LINDB**"), the Brazilian courts will admit evidence collected in a foreign country as long as its collection has not involved a violation to public policy. Thus, there is no legal basis for a judge to find the evidence sought in the Rule 2004 motion inadmissible under Brazilian law.

59.     Consequently, a Brazilian court would find admissible the evidence Sablon Partners Ltd. seeks through the Rule 2004 Motion.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed in São Paulo, Brazil on November 10th, 2023.

**ALEXANDRE FIDALGO**