**QUINN EMANUEL URQUHART & SULLIVAN, LLP**
Michael B. Carlinsky
Benjamin I. Finestone
Mario O. Gazzola
51 Madison Avenue, 22nd Floor
New York, NY 10010
Tel: (212) 849-7186
Fax: (212) 849-7100

*Counsel for LTS Trading Company LLC and Cedar Trade
LLC*

**UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| _____ ) | |
| In re:                                                              ) | |
|                                                                       ) | Case No. 23-10092 (MEW) |
| Americanas S.A., et al.,[1]                              ) | |
|                                                                       ) | Chapter 15 |
|              Debtors in a Foreign Proceeding.    ) | (Jointly Administered) |
| _____ ) | |

**OBJECTION OF LTS TRADING COMPANY LLC AND CEDAR TRADE LLC TO
SABLON PARTNERS LTD'S MOTION FOR ENTRY OF AN ORDER PURSUANT TO
BANKRUPTCY RULE 2004 AUTHORIZING THE EXAMINATION OF
AMERICANAS AND B2W DIGITAL AND THIRD PARTIES**

---

[1]       The debtors in these chapter 15 cases, along with the last four digits of each debtor's tax identification number in their applicable jurisdiction of incorporation, are as follows: Americanas S.A. (06-60 – Brazil); JSM Global S.á.r.l. (5670 – Grand Duchy of Luxemburg); and B2W Digital Lux S.á.r.l. (8659 – Grand Duchy of Luxemburg).

# TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ...................................................................................1

BACKGROUND ........................................................................................................4

I.      THE REFERENCE SHAREHOLDERS ..............................................................4

II.     DEBTORS DISCLOSE THE ACCOUNTING INCONSISTENCIES AND
        COMMENCE THE BRAZILIAN RJ PROCEEDING .......................................6

III.    CREDITORS IN BRAZIL MAKE USE OF THE APPROPRIATE BRAZILIAN
        PROCEDURAL TOOLS TO REQUEST DOCUMENTS AND PURSUE
        CLAIMS ...........................................................................................................7

IV.     INVESTIGATIONS INTO THE REFERENCE SHAREHOLDERS REVEAL
        NO WRONGDOING..........................................................................................9

V.      THE REFERENCE SHAREHOLDERS' WORK TO SAVE THE COMPANY .............12

DISCUSSION ..........................................................................................................14

I.      CHAPTER 15 AUTHORIZES DISCOVERY REQUESTS FROM THE
        FOREIGN REPRESENTATIVE AND SABLON IS NOT THE FOREIGN
        REPRESENTATIVE .......................................................................................14

II.     RULE 2004 DOES NOT ALLOW CREDITORS TO SEEK DISCOVERY IN
        CHAPTER 15 CASES FOR AN IMPROPER USE............................................16

III.    THE MOTION IS AN IMPROPER ATTEMPT TO CIRCUMVENT
        ESTABLISHED DISCOVERY PROCEDURES IN BRAZIL .........................20

IV.     THE "POTENTIAL ACTIONS AVAILABLE TO CREDITORS IN BRAZIL"
        ARE NOT ACTIONS WITHIN THE FOREIGN MAIN PROCEEDING .......................24

V.      RULE 2004 DOES NOT AUTHORIZE DISCOVERY INTO THIRD PARTIES
        LTS TRADING AND CEDAR TRADE.........................................................27

CONCLUSION ........................................................................................................30

## <u>TABLE OF AUTHORITIES</u>

<u>Page</u>

### <u>Cases</u>

*In re Aguila Energia e Participacoes Ltda.*,
2023 WL 7001445, at *5 (S.D.N.Y. Aug. 22, 2023)........................................................21, 22

*In re Asia Mar. Pac. Ltd.*,
253 F. Supp. 3d 701 (S.D.N.Y. 2015)....................................................................................21

*Bates v. United States*,
522 U.S. 23 (1997)..................................................................................................................17

*In re Bennett Funding Grp., Inc.*,
203 B.R. 24 (Bankr. N.D.N.Y. 1996) ....................................................................................22

*In re Buick*,
174 B.R. 299 (Bankr. D. Colo. 1994) ....................................................................................29

*In re China Fishery Grp. Ltd.*,
2017 WL 3084397 (Bankr. S.D.N.Y. July 19, 2017) .............................................................28

*In re China Medical Technologies*,
No. 12-13736 (Bankr. S.D.N.Y. March 29, 2013)...................................................................15

*In re Coffee Cupboard, Inc.*,
128 B.R. 509 (Bankr. E.D.N.Y. 1991)...........................................................................24, 27

*In re Comair Ltd.*,
2021 WL 5312988 (Bankr. S.D.N.Y. Nov. 14, 2021) ...........................................................16

*In re Dairy Mart Convenience Stores, Inc.*,
272 B.R. 66 (S.D.N.Y. 2002), *aff'd*, 351 F.3d 86 (2d Cir. 2003) ..........................................17

*In re Enron Corp.*,
281 B.R. 836 (Bankr. S.D.N.Y. 2002) ..............................................................................19, 28

*In re Gawker Media LLC*,
2017 WL 2804870 (Bankr. S.D.N.Y. June 28, 2017).............................................................28

*In re Golden Sphinx*,
2023 WL 2823391 (Bankr. C.D. Cal. Mar. 31, 2023) ...........................................1, 17, 18, 19

*In re Hilsen*,
2008 WL 2945996 (Bankr. S.D.N.Y. July 25, 2008) .............................................................27

*In re Ionosphere Clubs, Inc.*,
    156 B.R. 414 (S.D.N.Y.), *aff'd* 17 F.3d 600 (2d Cir. 1994) ...................................................28

*JP Morgan Chase Bank v. Altos Hornos de Mexico, S.A. de C.V.*,
    412 F.3d 418 (2d Cir. 2005)............................................................................................20

*In re JSC BTA Bank*,
    434 B.R. 334 (Bankr. S.D.N.Y. 2010)...........................................................................21

*In re Millennium Glob. Emerging Credit Master Fund Ltd.*,
    471 B.R. 342 (Bankr. S.D.N.Y. 2012)........................................................................15, 16

*In re Perforadora Oro Negro, S. de R.L. de C.V.*,
    No. 18-11094 (Bankr. S.D.N.Y. June 27, 2018)..............................................................15

*Sebelius v. Cloer*,
    569 U.S. 369 (2013)........................................................................................................17

*In re SNP Boat Serv. SA*,
    453 B.R. 446 (Bankr. S.D. Fla. 2011)............................................................................15

*SNP Boat Serv. SA v. Hotel Le St. James*,
    483 B.R. 776 (S.D. Fla. 2012) .......................................................................................15

*In re Summit Glob. Logtics*,
    2008 WL 1446722 (Bankr. D.N.J. Apr. 9, 2008) ...........................................................29

*In re SunEdison, Inc.*,
    572 B.R. 482 (Bankr. S.D.N.Y. 2017)............................................................................28

*In re Texaco Inc.*,
    79 B.R. 551 (Bankr. S.D.N.Y. 1987)..............................................................................30

*Victrix S.S. Co., S.A. v. Salen Dry Cargo A.B.*,
    825 F.2d 709 (2 Cir. 1987).............................................................................................20

*In re Youk-See*,
    450 B.R. 312 (Bankr. D. Mass. 2011) ...........................................................................28

## Statutes

11 U.S.C. §§ 101-1532 .........................................................................................................6

11 U.S.C. § 105(a) ............................................................................................................6, 17

11 U.S.C. § 362.....................................................................................................................6

11 U.S.C. § 1501 *et seq*............................................................................................... *passim*

28 U.S.C. § 1782 ..................................................................................................................21, 22

## <u>Other Authorities</u>

Fed. R. Bankr. P. 2004 ........................................................................................................ *passim*

Fed. R. Bankr. P. 9001 ............................................................................................................3, 27

LTS Trading Company LLC ("LTS Trading"), and Cedar Trade LLC ("Cedar Trade"), by their undersigned attorneys, respectfully submit this objection to Sablon Partners Ltd.'s ("Sablon") Motion For Entry Of An Order Pursuant To Bankruptcy Rule 2004 Authorizing The Examination Of Debtors Americanas And B2W Digital And Third Parties (ECF No. 28) (the "Motion") and in support hereof state as follows:

## PRELIMINARY STATEMENT

1.      Movant is a lone creditor in these Chapter 15 proceedings holding just $1 million of bonds out of a multi-billion dollar estate, who complains about purported Brazilian discovery limitations despite having not even attempted to seek the information it claims it needs in Brazil. Rather, Movant asks this Court to sanction an expansive "fishing expedition" for evidence supporting baseless conspiracy theories that the Company's reference shareholders—three individuals collectively holding approximately 30% of Americanas' shares, whom are contributing approximately R$12 billion to the Debtor's estate in order to rescue its operations—participated in the accounting inconsistencies that led to the Company filing its Brazilian RJ Proceeding on January 19, 2023.

2.      Movant cites just one case for the proposition that Rule 2004 discovery is available to creditors in Chapter 15 proceedings—an out-of-Circuit decision that contradicts authority within this District. But even as Movant's own inapplicable authority makes clear, creditors seeking to engage "in the so-called Rule 2004 'fishing expedition,' notwithstanding that the whole point of Chapter 15 is to avoid a multiplicity of international proceedings" are not seeking discovery for a "proper use." *In re Golden Sphinx*, 2023 WL 2823391, at *3 (Bankr. C.D. Cal. Mar. 31, 2023).

3.      Indeed, the misleading timeline Movant sets forth in support of its Motion reveals the improper purpose behind Movants' requests. Contrary to Movant's assertions that "no adequate investigation" is ongoing in Brazil, Americanas' accounting inconsistencies are one of

1

the most heavily investigated topics in Brazil in recent times, with no fewer than five completed or ongoing investigations.

4.      However, every neutral body to investigate the accounting inconsistencies—including the judicial administrators of the Brazilian RJ Proceeding and a Parliamentary Committee of Inquiry installed by the Brazilian congress (the "CPI")—have found no evidence connecting the reference shareholders to any wrongdoing.  Those unquestionably independent investigatory bodies considered the "evidence" cited by Movant, and upon concluding their investigations, decided not to recommend claims against the reference shareholders.  And, Movant conveniently leaves out of its narrative that some of the former executives responsible for the fraud have entered into plea bargains with the Brazilian authorities, in which they admitted to their wrongdoing.

5.      This record makes clear that Movant's real gripe is not that there are no investigations—but rather that the investigations have not revealed evidence against the reference shareholders, who Movant presumably views as potential deep pockets for claims.  Movant's request before this Court to conduct a fishing expedition should be denied for at least five reasons.

6.      *First*, as a threshold matter, the authority in this district makes clear that the Motion must be denied for the simple reason that Sablon is not the foreign representative in these proceedings.  Chapter 15 of the Bankruptcy Code grants an exclusive statutory right to the foreign representative to obtain discovery and examine witnesses.  The statute, by its express language, does not afford that right to other parties.  Accordingly, the Motion can be disposed of without further inquiry into the nature of its requests.

7.      *Second*, even if Rule 2004 discovery were available to creditors in Chapter 15 proceedings notwithstanding the statutory text of the Bankruptcy Code, the use of Rule 2004

discovery is permissible only under specific and narrow circumstances that are not present here. While Rule 2004 ordinarily permits broad discovery rights, in a Chapter 15 proceeding, those broad rights belong to the *foreign representative* alone.

8.      *Third*, even if Sablon were entitled to discovery under Rule 2004, the Motion is an impermissible end-run around established discovery procedures in Brazil, where, as Sablon concedes, discovery cannot be obtained against third parties in RJ proceedings.  While discovery is available in Brazil in separate civil lawsuits to creditors making appropriate requests, one court has *rejected* another creditor's request for a depositions of one of the reference shareholders.  As a matter of comity, Sablon's request for a fishing expedition in this Court should be denied, and Sablon should be required to seek evidence in Brazil through the appropriate vehicles available outside of the Brazilian RJ Proceeding.

9.      *Fourth*, as Sablon concedes, the purported potential actions Sablon asserts are available to creditors in Brazil are not claims or actions that could be filed against LTS Trading, Cedar Trade, or the reference shareholders ***within the Brazilian RJ proceeding***—if they can be filed at all.  The bankruptcy judge in the Brazilian RJ proceeding has explicitly stated that claims relating to who is responsible for the accounting inconsistencies are not properly heard within that proceeding, and must be brought as separate civil actions.  Accordingly, Sablon admittedly does not seek to use its Rule 2004 discovery in support of the foreign main proceeding, but rather to cook up a multiplicity of unrelated lawsuits that are not under the jurisdiction of the Brazilian RJ court.

10.     *Finally*, Sablon cannot seek discovery from LTS Trading and Cedar Trade as neither of these third-party vehicles are "debtors" within the meaning of Rules 2004 and 9001. Even if they could be deemed to be debtors, the Motion should nevertheless be denied because

3

Sablon fails to establish good cause to seek discovery from these entities, which have no substantive involvement with the Debtors. To the extent the third party investment vehicles have any relevant information, the broad discovery requested from them is duplicative of requests Sablon seeks from other parties.

11.    For the reasons that follow, the Motion should be denied.

## **BACKGROUND**

## I.    **THE REFERENCE SHAREHOLDERS**

12.    Jorge Paulo Lemann, Marcel Hermann Telles, and Carlos Alberto da Veiga Sicupira (together, the "Reference Shareholders") are three of the most prominent businessmen and philanthropists in Brazil. Blattner Decl. ¶ 11. Together, they own 271,834,960 common Americanas shares, representing approximately 30.12% of Americanas' total outstanding shares (which trade exclusively on B3, the Brazilian stock exchange). *Id.* ¶ 13. In the past ten years, only one of the Reference Shareholders, Mr. Sicupira, has been a member of Americanas' Board of Directors. None of the Reference Shareholders is employed by the Company, and thus their participation in its management is limited to designating certain board members and Mr. Sicupira's participation on the board. *Id.* ¶ 15.

13.    In the past 10 years, the Reference Shareholders have received dividends from Americanas—at amounts per share consistent with all public shareholders—totaling R$714 million (approximately $143 million). In that same timeframe, however, the Reference Shareholders have contributed R$2.3 billion to Americanas capital increases (approximately $460 million). Therefore, the Reference Shareholders have invested approximately R$1.6 billion more (approximately $320 million) in the Company over the past 10 years than they have received. Blattner Decl. ¶ 14.

4

14.    The Reference Shareholders invest and conduct business together through the use of several different legal entities under the "LTS" acronym, which stands for Lemann, Telles, and Sicupira.   While the Reference Shareholders control various entities that include the LTS acronym, not all of them are related, or even within the same corporate family.   That is, there is not any "'LTS' group of companies'" as Movant suggests, Mot. at 1, but rather several.[2]  Blattner Decl. ¶ 16.

15.    The LTS entity that supports the Reference Shareholder's designees to Americanas' Board of Directors is based in Brazil, has no operations or employees in the United States, and has not been named in this action.  Blattner Decl. ¶ 17.

16.    LTS Trading is a defunct investment vehicle that was once used for passively holding shares in several companies in which the Reference Shareholders coinvest.  It has not held Americanas shares since September 2022.  It is in the course of being dissolved, and has no relation to the group of LTS entities that supported the Reference Shareholders in their management of Americanas.  It exists within an entirely different corporate family, with no direct or indirect parent, subsidiary, or affiliate relationship with the relevant LTS entities, which are all subject to discovery in Brazil.  Blattner Decl. ¶ 18.

17.    Cedar Trade is an investment vehicle through which one of the Reference Shareholders holds 3% of Americanas' shares.   It has no employees, no operations, and no involvement with Americanas' management or operations.  Blattner Decl. ¶ 20.

---

[2]    Movant also names LTS Investment Holdings, LLC and LTS Investments, Inc. as discovery targets.  Mot. ¶ 7c.  While those entities use an "LTS" acronym, they are not owned or controlled by the Reference Shareholders, and have no relation to LTS Trading, Cedar Trade, or the Reference Shareholders in general.  Blattner Decl. ¶ 19.

## II.   DEBTORS DISCLOSE THE ACCOUNTING INCONSISTENCIES AND COMMENCE THE BRAZILIAN RJ PROCEEDING

18.     On January 11, 2023, Americanas issued a *Fato Relevante (Material Fact)* press release announcing the discovery of the accounting inconsistencies.  Blattner Decl. ¶ 22; Blattner Decl. Ex. 1.

19.     On January 19, 2023, Americanas S.A., JSM Global S.a.r.l., and BW2 Digital Lux S.a.r.l. (together, "the Chapter 15 Debtors") commenced a jointly-administered judicial reorganization (recuperação judicial or "RJ") proceeding (the "Brazilian RJ Proceeding") under Federal Law No. 11.101/2005, of the laws of the Federative Republic of Brazil.  The Brazilian RJ Proceeding is pending before the 4th Business Court of Rio de Janeiro.  Blattner Decl. ¶ 26.

20.     On January 25, 2023, Antonio Reinaldo Rabelo Filho, the Debtors' duly-authorized foreign representative (within the meaning of 11 U.S.C. §§ 101-1532), filed the Petitioner's Declaration and Verified Petition for Recognition of the Brazilian RJ Proceeding and Motion for Order Granting Relief Pursuant to 11 U.S.C. §§ 105(a), 1509, 1515, 1517, 1520, and 1521 in the above-captioned Chapter 15 cases.  ECF Nos. 1, 3.

21.     The Court then entered an order on January 27, 2023 granting provisional relief under 11 U.S.C. § 362, pending a final hearing on recognition of the Brazilian RJ Proceeding and a ruling with respect to the Verified Petition.  ECF No. 17.

22.     In just the 15 days following the disclosure of the accounting inconsistencies and the filing of the Brazilian RJ Proceeding, Americanas' stock price cratered.  The Reference Shareholders' 271,834,960 shares lost R$3.2 billion of value in that period (approximately $650 million).  Blattner Decl. ¶ 24.

**III.    CREDITORS IN BRAZIL MAKE USE OF THE APPROPRIATE BRAZILIAN
PROCEDURAL TOOLS TO REQUEST DOCUMENTS AND PURSUE CLAIMS**

23.     Creditors in Brazil other than Sablon have made extensive use of the avenues
available to them to seek evidence outside of the Brazilian RJ Proceeding, including some of the
creditors who have appeared in this action.  Blattner Decl. ¶¶ 38-46.

24.     On January 23, 2023, Banco Bradesco S/A ("Bradesco") filed a separate civil
lawsuit in Brazil seeking access to all correspondence and evidence that Americanas' board
members, committee members, C-suite officers and other employees have exchanged or produced
in the last ten years regarding the alleged "accounting inconsistencies" and the depositions of
Miguel Gutierrez (Americanas' CEO from [year] to December 2022), Sergio Rial (Americanas'
CEO from January 1, 2023 to January 11, 2023), and Andre Covre (Americanas' CFO from
January 1, 2023 to January 11, 2023).  Bradesco's document requests were granted, and the
evidence was submitted to a court-appointed expert.  However, Bradesco's requests for testimony
were denied and, ultimately, no documents were produced in that action because Bradesco
voluntarily stayed its requests.  Blattner Decl. ¶¶ 38-40.

25.     On January 23, 2023, Banco Santander (Brasil) S.A. ("Santander") filed a separate
civil lawsuit in Brazil seeking access to all correspondence and evidence that Americanas' board
members, the controlling shareholders, committee members, and executives have exchanged over
the past ten years.  The court partially granted the request for documents from the board, directors,
fiscal committee, audit committee, and finance employees, but rejected the request for testimony.
However, ultimately, no documents were produced in that action because Santander voluntarily
stayed its requests.  Blattner Decl. ¶ 41.

26.     On January 24, 2023, Itaú Unibanco S.A. ("Itaú")—which appeared in this
proceeding on February 9, 2023, ECF No. 22—filed a separate civil lawsuit in Brazil seeking

production of documents from and a deposition of Mr. Sicupira, one of the Reference Shareholders. Itaú's requests for testimony in that lawsuit were denied, but Itaú's requests for documents were granted.  However, ultimately no documents were produced in that action because Itaú voluntarily stayed its requests.  Blattner Decl. ¶ 45.

27.    Also on January 24, 2023, Banco Safra S/A ("Safra")—which appeared in this proceeding on July 27, 2023, ECF No. 40—filed a separate civil lawsuit in Brazil seeking access to all correspondence and evidence that Americanas' board members, committee members, C-suite officers and other employees exchanged or produced in the last ten years regarding the alleged "accounting inconsistencies."  No decision has been rendered because Safra has voluntarily stayed its requests in that lawsuit.  Safra has since requested to lift the stay, but that request remains pending.  Blattner Decl. ¶ 42.

28.    On February 16, 2023, several funds administered by Itaú ("Itaú Funds") initiated a separate civil lawsuit in Brazil against the Debtors seeking production of documents, including Americanas' balance sheets, fiscal books and audit reports and all messages exchanged with employees and executives of the company, its Reference Shareholders, and their related parties, involving the financial statements of Americanas.  On March 22 and 30, 2023 the Itaú Funds also filed two separate lawsuits seeking documents from Americanas' board and its executives.  No decision has been rendered in those lawsuits because the Itaú Funds have voluntarily stayed their requests.   Blattner Decl. ¶¶ 43-44.

29.    Potential labor creditors in Brazil have been particularly active in filing affirmative litigation.  Those potential labor creditors have filed eight class action lawsuits and twenty-two individual labor actions against the Reference Shareholders seeking to pierce Americanas'

corporate veil and hold the Reference Shareholders responsible for credits relating to labor claims. Blattner Decl. ¶¶ 47-50.

30.    Each and every labor creditor lawsuit to reach a ruling has rejected requests to pierce the veil and requests to allow claims against the Reference Shareholders due to lack of evidence.  Blattner Decl. ¶¶ 51-52.

## IV.    **INVESTIGATIONS INTO THE REFERENCE SHAREHOLDERS REVEAL NO WRONGDOING**

31.    Since the Brazilian RJ Proceeding was instituted, several independent bodies have investigated the circumstances leading to the accounting inconsistencies or heard claims against the Reference Shareholders and concluded that the Reference Shareholders did not participate in wrongdoing.  *See* Blattner Decl. ¶¶ 31, 57-66.

32.    On March 20, 2023, the court-appointed judicial administrators of the Brazilian RJ Proceeding issued a 452-page report regarding the accounting inconsistencies, following a review of over 38,000 pages of documents.  Blattner Decl. ¶ 31.  The judicial administrator found no evidence of wrongdoing by the Reference Shareholders.  *Id.*

33.    On April 26, 2023, Brazilian congress formed the CPI to investigate the nature of the fraud.  Dozens of witnesses testified before the CPI, including current management.  Blattner Decl. ¶ 57.

34.    On June 13, 2023, current management presented clear evidence to the CPI that the fraud was orchestrated by Miguel Gutierrez, the Company's former CEO, and six other former executives.  Blattner Decl. ¶ 58.  The presentation—which included emails and Whatsapp exchanges between the former executives—showed that Americanas' executives prepared two versions of Americanas' financial statements.  *Id.*  One version labeled "internal" showing a R$733 million loss, and another labeled "board of directors," showing a R$2.8 billion profit.  The "board

of directors" document was the only version presented to the board—and was consistent with the misleading disclosures the former executives made to the market. The Company's June 13, 2023 presentation to the CPI included internal Whatsapp conversations between the former executives demonstrating that they were aware of the company's real financial situation and discussed that Americanas' real leverage "could not be disclosed to the board or to the market," and that doing so would result in "sudden death." Blattner Decl. ¶ 58; Blattner Decl. Ex. 3 at 5. As discussed *supra*, given that the Reference Shareholders' only participation in the management of the Company is through the board, *see* Blattner Decl. ¶ 15, this evidence makes clear that the former executives intentionally kept the Reference Shareholders in the dark.

35.    That same day, the Company released a disclosure to the market identifying Gutierrez and the six former executives as the architects of the fraud. *Id.* ¶ 58.

36.    On August 1, 2023, Carla Bellangero, a partner at KPMG, testified before the CPI. Contrary to Sablon's assertions, Ms. Bellangero did not testify that "the Board of Directors was aware of the Fraud since at least 2019." Mot. at 26. Notably, Sablon chose to not to file a copy of the transcript of Ms. Bellangero's deposition, which is publicly available. Instead, Sablon chose to cite a newspaper article that purports to substantiate its baseless allegations that the board of directors knew about the fraud. Fidalgo Decl. Ex. I. However, even the article Sablon cites does not support its proposition, and the transcript reveals that Ms. Bellangero never testified the board was aware of the fraud. Blattner Decl. ¶ 59. Indeed, Ms. Bellangero's testimony plainly contradicts Sablon's narrative: she stated that "nothing, nothing indicated a fraud, no document suggested this situation of an intentional act." *Id.*

37.    On August 22, 2023, Sergio Rial, the former-CEO of Americanas, testified before the CPI. Mr. Rial replaced Mr. Gutierrez as CEO in January 2023 as an outside hire. Shortly after

23-10092-mew    Doc 51    Filed 12/05/23    Entered 12/05/23 21:02:53    Main Document
Pg 16 of 36

Mr. Rial took over the CEO role, certain of the former executives disclosed the accounting inconsistencies to him, and he made the decision to promptly disclose those inconsistencies to the market. In his sworn testimony before the CPI, Mr. Rial stated that there was no evidence of the involvement of the Reference Shareholders in the accounting issues. Blattner Decl. ¶ 60.

38.     On September 4, 2023, the CPI issued its final report and declined to recommend charges against the Reference Shareholders. Blattner Decl. ¶ 61.

39.     Mr. Gutierrez himself was subpoenaed to testify at the CPI proceedings. However, Mr. Gutierrez—who is a dual Brazilian and Spanish national—had previously escaped to Spain on or around the time of the disclosure of the accounting inconsistencies. He refused to travel back to Brazil to testify in person before the CPI and asserted his constitutional right to remain silent. He was ordered by the Brazilian Supreme Court to appear before the CPI, but he never showed up. Instead, on the day the CPI was concluded, he submitted a self-serving letter attempting to deflect blame for his own actions onto the Reference Shareholders. Mr. Gutierrez's self-serving letter did not provide any evidence of the Reference Shareholder's involvement in the accounting inconsistencies, and did not refute any of the email and Whatsapp message evidence presented by the Company showing that Mr. Gutierrez and the executives were responsible for the accounting inconsistencies. Blattner Decl. ¶ 62. It is that self-serving letter that Sablon relies upon to suggest that the Reference Shareholders may have been involved, although Sablon left out the critical details that Mr. Gutierrez disobeyed a subpoena and court order before submitting it. *See* Mot. ¶ 25.

40.     The CPI nevertheless temporarily re-opened its investigation upon receiving Mr. Gutierrez's letter, and considered and rejected its claims. Contrary to Sablon's suggestions that the CPI report was inconclusive, the amended final report noted that Gutierrez failed to add any

new evidence to the CPI's records and that Gutierrez's letter did not change the outcome of the CPI.  The CPI was concluded on September 27, 2023.  Blattner Decl. ¶ 63.

41.    Additionally, the Company appointed an independent board committee to investigate the accounting inconsistencies on January 12, 2023, led by Otavio Yazbek, a respected professor, lawyer, and former director of Brazil's equivalent to the SEC, the Comissão de Valores Mobiliários ("CVM").   That investigation is ongoing, and the Reference Shareholders have cooperated fully with the independent committee's requests.  Blattner Decl. ¶¶ 23, 65.

42.    Further, the CVM is in the process of investigating the accounting inconsistencies and the parties involved.  Blattner Decl. ¶ 64.

43.    Additionally, the Brazilian Federal Public Prosecutor's Office started an investigation to assess potential criminal liability of the individuals involved in the accounting inconsistencies.  The investigations are still ongoing and at least two former executives have executed plea bargains admitting their role in the wrongdoing.  While those plea bargains remain under seal, the press has reported that they indicate Mr. Gutierrez and the other former executives are to blame.  Blattner Decl. ¶ 66.

44.    In sum, it is simply not true that creditors' rights are not being protected in Brazil, or to say that the current investigations are inadequate.   The Americanas accounting inconsistencies are a result of perhaps the largest corporate fraud in Brazilian history, and have been heavily investigated by virtually every empowered entity in Brazil.  The investigations that have completed their work have declined to recommend charges against the Reference Shareholders.

## V.    <u>THE REFERENCE SHAREHOLDERS' WORK TO SAVE THE COMPANY</u>

45.    While all those investigations and lawsuits targeting their personal assets have been ongoing, the Reference Shareholders have nevertheless been hard at work to ensure the

survival of the Company, and, importantly, to ensure that employees and micro-trade creditors get paid in full.  Blattner Decl. ¶¶ 53-54.

46.    In February 2023, the Reference Shareholders funded the Debtors' debtor-in-possession financing through a loan of approximately R$1.5 billion (roughly $303 million). Blattner Decl. ¶ 54.

47.    Since providing that initial debtor-in-possession financing, the Reference Shareholders have negotiated extensively with the Debtors' largest creditors over the course of the last ten months in order to strike a deal to ensure the Company can survive on a forward-looking basis.  Blattner Decl. ¶ 55.

48.    In that deal, which is captured in the Debtor's proposed restructuring plan, the Reference Shareholders have agreed to contribute a further R$10.5 billion in new capital to the Company (approximately $2.13 billion) through additional loans and capital increases, while the Company's largest creditors have agreed to reduce their claims to 50%.  Creditors holding approximately 35% of claims have already agreed to support that restructuring plan, including creditors who appeared in these proceedings and who could have made timely requests here months ago: Itaú and BTG.  Based on the amount of credit represented by creditors who have executed the plan support agreement or otherwise indicated their intent to vote in favor of the plan, the Debtors and the Reference Shareholders expect the restructuring plan will be approved. Blattner Decl. ¶¶ 36, 56.

49.    Therefore, when all is said and done, the Reference Shareholders will have invested approximately R$12.0 billion ($2.44 billion) to rescue the Company between the debtor-in-possession financing and the restructuring plan, notwithstanding their over R$3.2 billion in losses. Blattner Decl. ¶ 56.

50.     On November 16, 2023, the Debtors requested a December 19, 2023 date for the Creditor's Meeting.  Blattner Decl. ¶ 33.

51.     On November 21, 2023, Safra requested that the December 19, 2023 date be rejected.  Blattner Decl. ¶ 34.

52.     On November 21, 2023, following receipt of Safra's request, the judge in the Brazilian RJ Proceeding set the Creditor's Meeting for December 19, 2023.   Safra sought reconsideration of the ruling setting the Creditor's Meeting on November 22, 2023, which the RJ judge rejected on December 1, 2023.  Blattner Decl. ¶ 35.

53.     Creditors who wish to preserve their claims have an avenue to do so in Brazil.  They must individualize their votes through a notification to the judicial administrator, and if they do not vote to approve the plan, they will be free to pursue any claims against the Company, the former executives, or even the Reference Shareholders.  *See* Blattner Decl. ¶ 37.

54.     Sablon has not indicated that it individualized its vote by the November 30, 2023 deadline, nor has it filed any requests to delay the Creditor's Meeting, or objections to the proposed restructuring plan, Blattner Decl. ¶ 37, raising even further questions regarding what it actually seeks to achieve through this Motion.

## **DISCUSSION**

**I.      CHAPTER 15 AUTHORIZES DISCOVERY REQUESTS FROM THE FOREIGN REPRESENTATIVE AND SABLON IS NOT THE FOREIGN REPRESENTATIVE**

55.     The express language of Chapter 15 authorizes discovery only for requests made by the foreign representative.  Section 1521 provides that "the court may, ***at the request of the foreign representative***, grant any appropriate relief, including . . . providing for the examination of witnesses, the taking of evidence or the delivery of information concerning the debtor's assets, affairs, rights, obligations or liabilities."  11 U.S.C. § 1521(a)(4) (emphasis added).  Section 1521

14

does not, by its terms, empower the court to grant discovery requests from parties *other* than the foreign representative. Yet that is precisely what Sablon seeks here.

56.      While it is not a common occurrence—perhaps because most parties-in-interest in a Chapter 15 proceeding recognize and abide by Section 1521's discovery limitations—courts confronted with this issue have denied discovery requests from parties who are not the foreign representative. *See, e.g.*, Gazzola Decl. Ex. A (*In re China Med. Techs.*, No. 12-13736, Order, ECF No. 91 (Bankr. S.D.N.Y. March 29, 2013)) (denying discovery requested by shareholders); Gazzola Decl. Ex. B (*In re Perforadora Oro Negro, S. de R.L. de C.V.*, No. 18-11094, Hr'g Tr. at 214:9-10, ECF No. 87 (Bankr. S.D.N.Y. June 27, 2018)) (denying "request for affirmative discovery by the bondholders"). Sablon cites no case law from this Circuit to the contrary.[3]

57.      Indeed, this court has recognized that the "authority under [sections] 1521 and 1507 gives benefits to foreign representatives that, by their terms, don't extend to other parties-in-interest." Gazzola Decl. Ex. C (*In re China Med. Techs.*, No. 12-13736, Hr'g Tr. at 17:9-11, ECF No. 111 (Bankr. S.D.N.Y. June 19, 2013)). The asymmetric discovery process is not unintentional. Rather, it reflects the fact that a Chapter 15 case—unlike a Chapter 11 proceeding—is an ancillary proceeding that exists "to assist a foreign representative in the administration of the foreign estate."

---

[3]    It is the rare—nigh, extraordinary—case when a court may consider ordering discovery from the debtor absent a request from the foreign representative. That has happened only when, unlike here, the foreign representative has been entirely unwilling to provide discovery with respect to the proceedings abroad based on the foreign state's so-called "blocking statute." *See, e.g., In re SNP Boat Serv. SA*, 453 B.R. 446, 447-49 (Bankr. S.D. Fla. 2011), *aff'd in part, rev'd in part and remanded sub nom., SNP Boat Serv. SA v. Hotel Le St. James*, 483 B.R. 776 (S.D. Fla. 2012) (denying foreign representative's request for protective order and ordering production of discovery as to the proceedings abroad notwithstanding the French blocking statute). That is not the case here. The foreign representative has not been accused of withholding discovery. And even in *In re SNP*, the relief granted did not include permitting discovery from a third party.

*In re Millennium Glob. Emerging Credit Master Fund Ltd.*, 471 B.R. 342, 347 (Bankr. S.D.N.Y. 2012).

58.     Sablon is indisputably *not* the foreign representative.  Accordingly, the Motion can be denied on this basis alone.

## II.     RULE 2004 DOES NOT ALLOW CREDITORS TO SEEK DISCOVERY IN CHAPTER 15 CASES FOR AN IMPROPER USE

59.     Nor can Sablon tiptoe past the statutory limitations set forth in Chapter 15 by invoking Bankruptcy Rule 2004 to authorize an otherwise impermissible right of discovery for parties other than the foreign representative.

60.     While Rule 2004 is available in Chapter 15 cases, the general consensus is that Chapter 15 "grant[s] *a foreign representative* broad discovery rights using the full scope of Rule 2004."  *In re Millennium Glob.*, 471 B.R. at  347 (emphasis added); *see In re Comair Ltd.*, 2021 WL 5312988, at *9 n.19 (Bankr. S.D.N.Y. Nov. 14, 2021) (collecting cases that discovery pursuant to Rule 2004 also applies in Chapter 15 cases).  This understanding is buttressed by section 1507(a)—which allows bankruptcy courts "to provide additional assistance *to a foreign representative* under [the Bankruptcy Code] or under other laws of the United States."  11 U.S.C. § 1507(a) (emphasis added).  Courts have read the "additional assistance" permitted in section 1507 to take the form of broad discovery rights under Rule 2004.  *See In re Millennium Glob.*, 471 B.R. at 348.

61.     But while Chapter 15 does not limit the scope of discovery that a foreign representative may seek, Rule 2004 does not supersede sections 1521 and 1507 to broaden the categories of parties who may seek discovery under those provisions.

62.     The language of section 1521 is plain:  discovery under Chapter 15 is permitted "at the request of the foreign representative."  Congress could have omitted that phrase entirely.  Or it

could have included "at the request of any party-in-interest to the proceeding." Indeed, it did so elsewhere in the Code. Rule 2004(a) provides that "on motion of any party in interest, the court may order the examination of any entity." Congress chose not to include that language in Chapter 15. When, as here, "Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion." *Sebelius v. Cloer*, 569 U.S. 369, 378 (2013) (citing *Bates v. United States*, 522 U.S. 23, 29–30 (1997)).

63.    Nor can Sablon rely on section 105 of the Code to read in a right to seek discovery. Section 105 authorizes the court to "issue any order, process or judgment that is necessary or appropriate to carry out the provisions of this title." 11 U.S.C. § 105(a). This court has made clear that the equitable powers under this section "cannot be used to ignore the specific and unambiguous provisions of the Bankruptcy Code." *In re Dairy Mart Convenience Stores, Inc.*, 272 B.R. 66, 73 (S.D.N.Y. 2002), *aff'd*, 351 F.3d 86 (2d Cir. 2003) (internal citations omitted).

64.    Sablon cites to just one single out-of-Circuit case suggesting that creditors may use Rule 2004 discovery. Mot. ¶ 52 (citing *Golden Sphinx*, 2023 WL 2823391, at *3). But even if *Golden Sphinx* were controlling here, it does not rescue Sablon's motion. The court in *Golden Sphinx* explained that "discovery normally should take place in the foreign main proceeding, because Chapter 15 cases are intended to be ancillary proceedings." *Golden Sphinx*, 2023 WL 2823391, at *3. But, it went on to say that it could "conceive of scenarios in which it ***might*** [be] appropriate for a creditor to seek discovery": (1) a request from the court overseeing the foreign main proceeding; (2) discovery relevant to a pending contested matter; (3) discovery necessary to defend against a motion or proceeding brought by the foreign representative; or (4) evidence presenting sufficient grounds to suspect the existence of a fraudulent transfer claim that the foreign

17

representatives were wrongfully refusing to pursue. *Id.* (emphasis added). None of those situations apply here, and Sablon does not even attempt to argue that they do.

65.    Rather, Sablon seeks this discovery "to engage in the so-called Rule 2004 'fishing expedition,' notwithstanding that the whole point of Chapter 15 is to avoid a multiplicity of international proceedings and instead focus most litigation in the foreign main proceeding." *Id.* Sablon barely hides this, citing approvingly to cases describing the Rule 2004 "fishing expedition" in support of its motion. Mot. ¶ 49 (quoting cases describing the Rule 2004 "fishing expedition"); ECF No. 50 at 1 (describing Sablon's purported right to a "fishing expedition"). This record makes clear that, apparently unsatisfied that the Brazilian congress's CPI proceedings rejected the evidence Sablon cites, Sablon comes to this Court to request a fishing expedition to attempt to identify evidence supporting frivolous claims against the Reference Shareholders.

66.    And while Sablon has attempted to argue that its "purpose or intent" does not obviate its right to seek Rule 2004 discovery in these Chapter 15 proceedings, ECF No. 50 at 2, *Golden Sphinx* stands for the opposite proposition. *Golden Sphinx*, 2023 WL 2823391, at *3.

67.    Sablon's attempt to justify its request by asserting that it is seeking this discovery in the "interests of all creditors," so that they can know "there exists an alternative method" to consider before voting on the plan makes no sense. ECF No. 50 at 2. *First*, there can be no doubt that Americanas' creditors are aware of the avenues available to them. Americanas' creditors include incredibly sophisticated entities, including some of the largest banks in Brazil. Three of them have appeared in this action, as have two different ad hoc groups, and all did so well before the eleventh hour, unlike Sablon. *See* ECF No. 22 (Feb. 9 appearance of Itaú); ECF No. 24 (Feb. 22 appearance of BTG); ECF No. 26 (Feb. 22 appearance of ad hoc group of noteholders); ECF No. 37 (May 22 appearance of additional ad hoc group of noteholders); ECF No. 40 (July 27

appearance of Safra).    Rather than seek evidence here, however, many of these creditors appropriately sought evidence in Brazil.  *See, e.g.*, Blattner Decl. ¶¶ 38-46.  *Second*, the suggestion that an order granting discovery could change the outcome of the Creditor's Meeting is also incorrect.  Under the plan support agreement signed by the Company's largest creditors—who have enough votes to approve the plan on their own—they are bound to vote in support of the plan regardless of what Sablon achieves here.  Blattner Decl. ¶ 36.

68.    This does not mean Sablon is without recourse—it could still obtain relief against third parties if it individualizes its vote and votes against the plan, in which case it could freely pursue all claims.  *See* Blattner Decl. ¶ 37.  And of course, Sablon could have sought to delay the Creditor's Meeting through filing appropriate motions in Brazil.

69.    But, given that Sablon chose not to individualize its vote, object to the plan, or request a delay of the Creditor's Meeting, *see id.* ¶ 37, its insistence on moving forward here notwithstanding the fact that it did not avail itself of the avenues available in Brazil to preserve its claims raises serious questions as to its true purpose, and whether its request is an attempt to harass the Reference Shareholders, *see In re Enron Corp.*, 281 B.R. 836, 840 (Bankr. S.D.N.Y. 2002) (limiting Rule 2004 discovery when purpose of the examination is to abuse or harass).

70.    Accordingly, here, as in *Golden Sphinx*, Sablon's attempted fishing expedition is not a proper use of 2004 discovery.  *Compare Golden Sphinx*, 2023 WL 2823391, at *3 (rejecting as a fishing expedition movant's proffered justifications for discovery highlighting that it "***may*** shed light" on issues in the foreign main proceeding (emphasis added)), *with* Mot. ¶ 56 (suggesting creditors' efforts "***could*** substantially enhance the Debtors' estates" (emphasis added)).

71.     The one-sided discovery process contemplated in Chapter 15, in which only the foreign representative is permitted to participate in classic "fishing expedition"-style Rule 2004 discovery therefore compels the denial of this Motion.

### III.   THE MOTION IS AN IMPROPER ATTEMPT TO CIRCUMVENT ESTABLISHED DISCOVERY PROCEDURES IN BRAZIL

72.     Assuming that Sablon were a proper party to seek discovery—and it is not—the Motion amounts to a transparent attempt to short-circuit the discovery process in Brazil.  Sablon's motion seeks to circumvent Brazilian discovery processes in at least three ways: (1) Sablon seeks discovery against third parties that it could not obtain within the foreign main proceeding; (2) Sablon seeks discovery (in the form of testimony) that Brazilian courts have refused to grant to other creditors bringing separate civil actions in Brazil; and (3) Sablon has admittedly made no attempt to seek certain of the discovery in Brazil for the sole reason that it may be time consuming.  *See* Mot. ¶ 40.  Accordingly, as a matter of comity, Sablon's request should be denied.  *JP Morgan Chase Bank v. Altos Hornos de Mexico, S.A. de C.V.*, 412 F.3d 418, 429 (2d Cir. 2005) ("International comity . . . involves . . . the discretion of a national court to decline to exercise jurisdiction over a case before it when that case is pending in a foreign court with proper jurisdiction."); *Victrix S.S. Co., S.A. v. Salen Dry Cargo A.B.*, 825 F.2d 709, 713 (2d Cir. 1987) ("American courts have long recognized the particular need to extend comity to foreign bankruptcy proceedings.").

73.     *First*, as Sablon concedes, discovery against third parties is not permitted in the Brazilian RJ Proceeding.  Tavares Guerreiro Decl. ¶¶ 10, 36-37; *see also* Mot. ¶ 39 ("Brazilian bankruptcy law does not provide for any type of evidence production within a main proceeding."). There is good reason for this: under Brazilian bankruptcy law, an RJ Proceeding's purpose is to promote rapid negotiations between a debtor and its creditors, Tavares Guerreiro Decl. ¶ 19, rather

than to identify the culpable parties, if any, leading to the bankruptcy, which is a purpose of *falência* proceedings under Brazilian law—a different bankruptcy option which was not used here, *id.* ¶ 34. Indeed, the court in the Brazilian RJ Proceeding has explicitly stated that claims against the architects of the fraud—or claims seeking to identify who is responsible—do not belong in those proceedings, which are focused on preserving the company and the tens of thousands of jobs it provides in Brazil. Blattner Decl. ¶ 28. Sablon's request that this Court supplant the proceedings in Brazil should be denied. *See In re JSC BTA Bank*, 434 B.R. 334, 337 (Bankr. S.D.N.Y. 2010) (explaining that the purpose of Chapter 15 is "to support, not supplant a main foreign proceeding in a foreign jurisdiction"). That does not mean Sablon is without recourse if Rule 2004 discovery is denied—just that it will be required to file separate civil evidence lawsuits in Brazil, as many other creditors have. Blattner Decl. ¶¶ 38-46.

74.    *Second*, at least one creditor in Brazil has initiated separate civil evidence proceedings in which they sought—and were *denied*—testimony from one of the Reference Shareholders, Mr. Sicupira. Blattner Decl. ¶ 45. Other creditors have also initiated separate civil evidence proceedings in which they sought testimony from other individuals, and have had those requests for testimony denied. Blattner Decl. ¶¶ 39, 41, 45.

75.    It is notable that Sablon is seeking documents and testimony from third-parties LTS Trading and Cedar Trade within this proceeding, rather than through other appropriate methods in the United States, such as a request through Section 1782 for discovery for use in a foreign proceeding. *See* 28 U.S.C. § 1782. Of course, Courts ruling on requests for Section 1782 discovery routinely deny requests that amount to "fishing expeditions," because such requests do not satisfy the relevant factors necessary for obtaining Section 1782 discovery. *See, e.g.*, *In re Asia Mar. Pac. Ltd.*, 253 F. Supp. 3d 701, 705 (S.D.N.Y. 2015) (explaining that even if movant

21

satisfied requirements of § 1782, "the Court would exercise its discretion to deny the petition because this is an overly broad fishing expedition that does nothing to further the twin aims of the statute").

76.    Sablon's request for discovery from LTS Trading and Cedar Trade closely resembles requests that have been denied under Section 1782.  For example, in *In re Aguila Energia e Participacoes Ltda.*, the Court heard a request for documents from JPMorgan USA concerning the involvement of JPMorgan Brazil and another party in a Brazilian transaction.  2023 WL 7001445, at *5 (S.D.N.Y. Aug. 22, 2023).  The Court rejected the request because the movant (1) failed to "demonstrate[] that JPMorgan USA has a connection to the transaction or exercises sufficient control over those entities," and (2) had not "commenced the Contemplated Proceedings or unsuccessfully sought the subject documents from the entities themselves." *Id.*  The *In re Aguila* court found these factors—which are also present in Sablon's request here—"suggest[] that Augila is on a fishing expedition and may be misusing the § 1782 device." *Id.*

77.    This backdrop makes clear that Sablon chose to seek discovery from third parties LTS Trading and Cedar Trade in this Court—rather than seeking discovery from the appropriate LTS entities in Brazil, or seeking discovery from LTS Trading and Cedar Trade through Section 1782—precisely because Sablon is seeking a "fishing expedition" that would be denied under the appropriate mechanisms.  Permitting such discovery here would thus "unavoidably and unintentionally create a back door through which" Sablon could side-step the restrictions of the Federal Rules of Civil Procedure, Section 1782, and Brazil's Civil Procedure Code (Código de Processo Civil) (Law No. 13.105/2015).  *See In re Bennett Funding Grp., Inc.*, 203 B.R. 24, 30 (Bankr. N.D.N.Y. 1996) (granting request to bar Rule 2004 examination of third party).

78.    *Third*, Sablon admits that the only thing stopping it from seeking this discovery in Brazil is that it may be "slow" and potentially "challeng[ing]."  Mot. ¶¶ 40, 42.  Sablon carefully does not assert that discovery is unavailable in Brazil, only that it "was ***historically*** a concept foreign to Brazilian civil procedure," *id.* ¶ 41 (emphasis added), and that while new document request procedures were created in 2021, those procedures are still "novel," *id.* ¶ 42.  Critically, however—and contrary to Sablon's assertion that documentary discovery "imposes significant challenges" in Brazil—much of the documentary information that Sablon seeks as part of its Rule 2004 examination includes evidence that has been previously requested and granted in Brazil to other creditors.  For example, creditors have filed requests for, among other things, (i) Americanas' balance sheets, books and records, and audit reports; (ii) the Reference Shareholders and their related parties' communications relating to Debtors' financial statements; and (iii) documents relating to the Debtors' audit committee and audit procedures.  *Compare* Blattner Decl. ¶¶ 38-46 *with* Dkt. 42-3 at 2-5.  The requests filed by other creditors in Brazilian courts—including the requests that were granted to Bradesco and Itaú, *see supra* ¶¶ 24, 26, demonstrate that Sablon could attempt to seek this discovery in Brazil, were it targeting the proper parties, and seeking an appropriate level of discovery.[4]

79.    However, having seen Brazilian courts deny requests for the Reference Shareholder's (and others') testimony, *see* Blattner Decl. ¶¶ 39, 41, 45,  Sablon chose to file here in hopes that it could circumvent the guardrails put in place by the Brazilian courts in order to prevent creditors from unduly interfering in the Brazilian RJ Proceedings.  Indeed, Sablon has

---

[4]   While documents have not been produced in those other lawsuits, it is because the creditors seeking those productions have agreed to stay their requests.  Blattner Decl. ¶ 46.  That voluntary decision by those creditors is not evidence that the discovery is unavailable to creditors in Brazil.  Rather, it is, at best, evidence that Sablon now regrets its initial decision to sit on the sidelines instead of filing appropriate requests in Brazil.

effectively admitted that its purposes are anti-comity, describing its request as "an alternative method" to properly obtaining discovery in Brazil.  ECF No. 50 at 2.

80.    Sablon's proposed discovery should therefore be denied because it seeks to circumvent procedural protections in place in Brazil to make up for Sablon's own delay in taking action.

## IV.    THE "POTENTIAL ACTIONS AVAILABLE TO CREDITORS IN BRAZIL" ARE NOT ACTIONS WITHIN THE FOREIGN MAIN PROCEEDING

81.    The purpose of Chapter 15 is to provide ancillary support for a foreign main bankruptcy proceeding, not other, unrelated proceedings.  *See In re Coffee Cupboard, Inc*., 128 B.R. 509, 516 (Bankr. E.D.N.Y. 1991) ("Rule 2004 examinations should not be used to obtain information for use in an unrelated case or proceeding pending before another tribunal.").

82.    Here, as Sablon concedes, the purported potential actions Sablon suggests may be brought by creditors in Brazil—to the extent they could be brought at all—can only be brought in civil proceedings outside the Brazilian RJ Proceeding.  Tavares Guerreiro Decl. ¶¶ 38-42; *see also* Mot. ¶ 36 (explaining that any actions would be "brought in parallel" with the foreign main proceeding).  Indeed, Sablon could not even use any discovery it obtains here within the foreign main proceeding.  Tavares Guerreiro Decl. ¶¶ 37, 43-45.  Accordingly, what Sablon seeks through its Motion is ancillary assistance for potential Brazilian civil litigation to be filed in lawsuits outside the foreign main proceeding—which is outside the scope of what Chapter 15 provides.

83.    Sablon suggests creditors in Brazil could bring four potential actions against the Reference Shareholders: (1) actions to pierce the corporate veil under Article 50 of the Brazilian Civil Code; (2) actions to recoup losses from the controlling shareholders under Article 117 of the Brazilian Corporations Act; (3) actions to recoup losses from managers and/or administrators

under Article 159 of the Brazilian Corporations Act; and (4) actions to annul fraudulent transactions.

84.    But, as Sablon concedes, none of those actions could be heard in the Brazilian RJ Proceedings, and would need to be brought instead as separate parallel actions.  Mot. ¶ 36; Tavares Guerreiro Decl. ¶¶ 41-42.

85.    In fact, even if Sablon's purported potential actions were available within the Brazilian RJ Proceedings, Sablon lacks standing to bring many of those claims, and lacks a plausible claim under the rest.

86.    *First*, piercing the corporate veil under Article 50 of the Brazilian Civil Code is only available in narrow circumstances provided under Brazilian law, none of which are present here.  To assert a claim for piercing the corporate veil, a plaintiff needs to show that the shareholder abused the legal entity by either deviating from its declared corporate purposes or by commingling its assets with the corporate assets.  Tavares Guerreiro Decl. ¶ 84.  A claim for piercing the corporate veil also requires the shareholder to have benefited from abusing the company's legal entity.  Tavares Guerreiro Decl. ¶¶ 90-91.  Sablon does not state any facts to show that the Reference Shareholders have abused Americanas' legal personality and, as stated *supra* ¶¶ 22, 49, not only did the Reference Shareholders not benefit from the accounting inconsistencies; they actually suffered substantial losses.  *See* Blattner Decl. ¶ 24.  Therefore, Sablon's claim for piercing the corporate veil is meritless.  Tavares Guerreiro Decl. ¶ 91.

87.    *Second*, Sablon does not have standing to bring claims under Brazilian Corporate Law for abuse of power under article 117 or for acts of mismanagement under article 159.   As a general rule, only the corporation itself has standing to bring those claims. Tavares Guerreiro Decl. ¶¶ 53, 64, 66.  Alternatively, the minority shareholders of a company can bring those claims

25

derivatively in case the corporation fails to act. *Id.* ¶¶ 59, 68. Sablon, as a creditor of Americanas, has no means of bringing these claims against any third party. *Id.* ¶¶ 65, 70.

88.    Furthermore, even if Sablon had standing to bring claims under Brazilian corporate law, such claims would fail as a matter of law. Sablon's basis for its lawsuits against the Reference Shareholders are Mr. Gutierrez's vague statements that the Reference Shareholders "actively participated in the financial management of the company." Fidalgo Decl. ¶ 33. Brazilian Corporate law requires that a shareholder engages in wrongdoing to be held liable for abuse of control or for acts of management. Tavares Guerreiro Decl. ¶¶ 73-74. Sablon does not state any plausible facts connecting the Reference Shareholders to any wrongdoing, as mere participation in the daily business of a company is not sufficient.

89.    *Third*, Sablon's purported action to annul alleged fraudulent transfers is equally meritless. Brazilian Bankruptcy law does not allow a creditor to bring a lawsuit for annulling fraudulent transaction within an RJ proceeding and such claim would need to be brought in a separate lawsuit under the general rule in the Brazilian Civil Code. Tavares Guerreiro Decl. ¶ 78. Under the Brazilian Civil Code, a lawsuit to annul fraudulent transactions requires a debtor to be insolvent. Here, Americanas is not insolvent, and under Brazilian law, the mere fact that a company started an RJ proceeding does not mean that it is insolvent. To the contrary, an RJ proceeding is only granted when a company sufficiently shows it has the necessary means to overcome its financial crisis. Tavares Guerreiro Decl. ¶ 79. For this reason alone, Sablon's annulment claim would fail.

90.    Additionally, Sablon could not even use the 2004 Discovery in the RJ Proceeding because the RJ Proceeding does not permit the introduction of evidence—particularly evidence

against third parties to the proceeding, such as the Reference Shareholders, LTS Trading, and Cedar Trade.  Tavares Guerreiro Decl. ¶¶ 43-45.

91.     Accordingly, the Motion should be denied for the additional reason that the discovery Sablon seeks is—at best—for actions other than the Foreign Main proceeding.

## V.     RULE 2004 DOES NOT AUTHORIZE DISCOVERY INTO THIRD PARTIES LTS TRADING AND CEDAR TRADE

92.     Even if some Rule 2004 discovery were proper, LTS Trading and Cedar Trade fall outside the scope of discovery authorized by Rule 2004.  They are not "debtors" within the meaning of Bankruptcy Rule 9001(5).  Rather, Cedar Trade is an investment vehicle holding no more than three percent of Americanas' shares, and does not participate in the management or operations of the Debtors.  LTS Trading is a wholly unrelated third party investment vehicle holding no Americanas shares with no connection to the matters relevant to these proceedings other than the fact that it is owned by the Reference Shareholders and it used to hold a relatively small amount of shares.  Rule 2004 does not permit unfettered discovery into any and all entities that have some connection to the debtor.

93.     Bankruptcy Rule 9001(5) defines "debtor" to include (1) any or all of its officers, (2) members of its board of directors, (3) members of its board of trustees, (4) controlling stockholder, or (5) any other person in control.  Fed. R. Bankr. P. 9001(5).  Rule 2004 by its terms limits examination to the "acts, conduct, or property of to the liabilities and financial condition of the *debtor*, or to any matter which may affect the administration of the debtor's estate."  Rule 2004(b) (emphasis added); *see In re Coffee Cupboard*, 128 B.R. 509, 514 (E.D.N.Y. 1991) (citations omitted). So, discovery does not extend to the assets of other entities. *In re Hilsen*, 2008 WL 2945996, at *4 (Bankr. S.D.N.Y. July 25, 2008) (Federal Rule of Bankruptcy Procedure 2004 "[i]s not a proper means to inquire with respect to non-estate property.").

94.     LTS Trading and Cedar Trade do not fit within any of the above categories.  As discussed *supra*, LTS Trading has no direct or indirect relationship with the entities the Reference Shareholders use to assist in their investment in Americanas.  It is merely a defunct entity previously used by the Reference Shareholders to passively hold shares in certain companies in which they jointly invest.  And Cedar Trade is an entity belonging to Mr. Lemann, one of the Reference Shareholders.  Mr. Lemann is not a member of the board of directors, the board of trustees, the audit committee, or a controlling stockholder.  Blattner Decl. ¶¶ 15-20.  In fact, the Reference Shareholders have not been the controlling stockholders of Americanas since its 2021 restructuring. *Id.* ¶ 13.

95.     While courts permit discovery as to non-debtor third parties in which a *debtor* owns a controlling interest, the debtors hold no interest in either LTS Trading or Cedar Trade.  Blattner Decl. ¶ 21.  At most, these investment vehicles are shareholders and occupy the same position as others seeking to be made whole.

96.     Even if the Court did find that these investment vehicles could fall within the scope of Rule 2004, Sablon cannot show good cause for the examination it seeks.  Third parties may be examined only insofar as they have dealings with the debtor.  *In re Ionosphere Clubs, Inc.*, 156 B.R. 414, 432 (S.D.N.Y.), *aff'd* 17 F.3d 600 (2d Cir. 1994).  Here, however, Sablon's requests clearly exceed the scope of Rule 2004 and seek information from vehicles that have virtually no dealings with the Debtor, and certainly no role in the Debtors' management or operations.

97.     Even if LTS Trading and Cedar Trade were proper Rule 2004 discovery targets, the Court should exercise its discretion to deny Sablon's requests for discovery.  *See In re Enron Corp.*, 281 B.R. 836, 840 (Bankr. S.D.N.Y. 2002) (noting the "permissive language" of Rule 2004(a)).

28

98.    "Relevance alone is not sufficient to justify a Rule 2004 request." *In re SunEdison, Inc.*, 572 B.R. 482, 489 (Bankr. S.D.N.Y. 2017); *In re China Fishery Grp. Ltd.*, 2017 WL 3084397, at *5 (Bankr. S.D.N.Y. July 19, 2017).  Sablon must also establish that the information requested is necessary to the claim of the party seeking examination or that denial of the request would cause the examiner undue hardship or injustice.  *See In re Gawker Media LLC*, 2017 WL 2804870, at *5 (Bankr. S.D.N.Y. June 28, 2017); *In re Youk-See*, 450 B.R. 312, 319 (Bankr. D. Mass. 2011).

99.    Sablon fails to explain how the documents it requests from LTS Trading and Cedar Trade would not be also in the possession of, for example, a member of the Board or the company itself.  *See In re Summit Glob. Logtics*, 2008 WL 1446722, at *4 (Bankr. D.N.J. Apr. 9, 2008).  The few limitations on Rule 2004 examinations ensure that examinations are not "so broad as to be more disruptive and costly to the [party] than beneficial to the creditor." *In re Texaco Inc.*, 79 B.R. 551, 553 (Bankr. S.D.N.Y. 1987); *see* Memo. Order Den. Mot. To Strike Certain Rule 2004 Appls., ECF. No. 10332, at 9 (Jan. 23, 2020) (Swain, J.) (limiting Rule 2004 discovery to "a core body of information in a manner that will not be unduly expensive or disruptive of operations and that will facilitate efficient responses to future similar requests").

100.    The proposed examinations are also overbroad because they seek public information.  For example, information about dividends paid to Cedar Trade can be obtained from public sources in Brazil.  Blattner Decl. ¶¶ 67-70.  When, as here, "the documents can be obtained from their original sources," that is the "more appropriate party to subpoena." *In re Summit Glob. Logtics*, 2008 WL 1446722, at *4.  Courts are "reticent to open the door to Rule 2004 examinations which might be identical to or duplicative of existing discovery needs." *In re Buick*, 174 B.R. 299, 305 (Bankr. D. Colo. 1994).

101.    Sablon has thus failed to carry its burden of showing good cause with respect to discovery from the third party investment vehicles.  For this reason, the Court should exercise its discretion to deny discovery into them.  The scope of a Rule 2004 examination "is not limitless; the examination should not be so broad as to be more disruptive and costly to the [party] than beneficial to the creditor."  *In re Texaco Inc.*, 79 B.R. at 553.

102.    Therefore, even if Sablon was the proper representative to bring this Motion, it should be denied as to the Reference Shareholders.

## **CONCLUSION**

103.    For the reasons set forth herein, the Motion should be denied insofar as it seeks discovery from LTS Trading and Cedar Trade.

Dated: December 5, 2023
   New York, New York

     QUINN EMANUEL URQUHART
      & SULLIVAN, LLP

By:  /s/ *Michael B. Carlinsky*

     Michael B. Carlinsky
     Benjamin I. Finestone
     Mario O. Gazzola
     51 Madison Avenue, 22nd Floor
     New York, New York 10010
     Telephone:  (212) 849-7000
     Facsimile:  (212) 849-7100

     *Counsel for LTS Trading Company LLC, and Cedar Trade LLC*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this same date, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to counsel for the parties of record.

*/s/Michael B. Carlinsky*
Michael B. Carlinsky
