WHITE & CASE LLP
1221 Avenue of the Americas
New York, New York 10020-1095
(212) 819-8200
John K. Cunningham
Gregory M. Starner
Ricardo M. Pasianotto (admitted *pro hac vice*)

Southeast Financial Center
200 South Biscayne Blvd., Suite 4900
Miami, Florida 33131
(305) 371-2700
Richard S. Kebrdle (admitted *pro hac vice*)

*Attorneys for Antonio Reinaldo Rabelo Filho,*
*as Petitioner and Foreign Representative*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | ) |
| | ) |
| Americanas S.A., *et al.*,[1] | ) Case No. 23-10092 (MEW) |
| | ) |
| | ) Chapter 15 |
| Debtors in a Foreign Proceeding. | ) (Jointly Administered) |
| | ) |

**FOREIGN REPRESENTATIVE'S OBJECTION TO MOTION OF**
**SABLON PARTNERS LTD. FOR ENTRY OF AN ORDER PURSUANT TO**
**BANKRUPTCY RULE 2004 AUTHORIZING THE EXAMINATION OF DEBTORS**
**AMERICANAS AND B2W DIGITAL AND THIRD PARTIES**

---

[1] The debtors in these chapter 15 cases, along with the last four digits of each debtor's tax identification number in their applicable jurisdiction of incorporation, are as follows:  Americanas S.A. (06-60 – Brazil); JSM Global S.à.r.l. (5670 – Grand Duchy of Luxembourg); and B2W Digital Lux S.à.r.l. (8659 – Grand Duchy of Luxembourg) (collectively, the "**Chapter 15 Cases**").

# TABLE OF CONTENTS

**Page(s)**

Preliminary Statement .................................................................................................1

Background ................................................................................................................5

    A.    The Americanas Group's Business and Shareholders Are Centered in Brazil ........6

    B.    Events Leading to the Filing of the RJ Proceeding Occurred in Brazil ..................6

    C.    The NY Notes ...............................................................................................7

    D.    The Chapter 15 Proceeding ............................................................................9

    E.    Ongoing Investigation Proceedings ...............................................................10

    F.    Investigation by the Independent Committee ..................................................11

    G.    Government-Led Investigations......................................................................12

    H.    The Brazilian RJ Investigation......................................................................13

    I.    Discovery by Brazilian Creditors...................................................................14

    J.    Recent Developments in the Brazilian RJ Proceeding and Negotiations with Creditors Toward a Consensual Plan ..............................................................14

JURISDICTION AND VENUE ..................................................................................18

Objection ................................................................................................................18

I.    Sablon's Request Goes Well Beyond the Discovery Permitted in Chapter 15 Cases .......18

    A.    Creditors Are Not Permitted to Take Broad Rule 2004 Discovery in Chapter 15 Cases .....................................................................................................20

    B.    The Requested Discovery Would Not Advance Any Legitimate Chapter 15 Purpose.....................................................................................................23

II.    Sablon Lacks Standing to Seek Discovery or Bring Claims Against the Chapter 15 Debtors ..............................................................................................................25

III.    The Motion Is an Abuse of Rule 2004 Against the Chapter 15 Debtors ...........................26

IV.    Sablon Cannot Demonstrate "Good Cause" to Support a Rule 2004 Examination...........29

    A.    Dissatisfaction with the Brazilian Discovery Process Does Not Establish "Good Cause" for Sablon's Rule 2004 Request ...................................................29

    B.    The Burdens of the Rule 2004 Examination Vastly Outweigh Any Purported Benefits .....................................................................................................31

    C.    Sablon's Request Amounts to an Impermissible Fishing Expedition...................33

Conclusion ..............................................................................................................33

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*Akanthos Cap. Mgmt., LLC v. CompuCredit Holdings Corp.*,
  677 F.3d 1286 (11th Cir. 2012) ............................................................26

*Chatham Capital Holdings, Inc. v. Conru*,
  2023 WL 22622 (S.D.N.Y. 2023)............................................................26

*Feldbaum v. McCrory Corp.*,
  No. 11866 (LA), 1992 WL 119095 (Del. Ch. Ct. June 2, 1992) ...........................................26

*In re A.B.C. Learning Centres Limited*,
  No. 10-11711 (KG) (Bankr. D. Del. June 6, 2013) ...............................................21

*In re AOG Entm't, Inc.*,
  558 B.R. 98 (Bankr. S.D.N.Y. 2016)......................................................31

*In re Bd. of Dirs. of Hopewell Int'l Ins. Ltd.*,
  258 B.R. 580 (Bankr. S.D.N.Y. 2001).................................................29, 30

*In re Bennett Funding Grp., Inc.*,
  203 B.R. 24 (Bankr. N.D.N.Y. 1996) .....................................................20

*In re Bernard L. Madoff Inv. Secs. LLC*,
  No. 08-01789 (SMB), 2014 Bankr. LEXIS 4603 (Bankr. S.D.N.Y. Oct. 30, 2014) ..............29

*In re Cambridge Analytica LLC*,
  600 B.R. 750 (Bankr. S.D.N.Y. 2019)................................................27, 28

*In re Countrywide Home Loans, Inc.*,
  384 B.R. 373 (Bankr. W.D. Pa. 2008) ....................................................19

*In re Dinubilo*,
  177 B.R. 932 (Bankr. E.D. Cal. 1993)....................................................20

*In re Drexel Burnham Lambert Grp., Inc.*,
  123 B.R. 702 (Bankr. S.D.N.Y. 1991)................................................20, 31

*In re Enron Corp.*,
  281 B.R. 836 (Bankr. S.D.N.Y. 2002)................................................19, 28

*In re Fairfield Sentry Ltd.*,
  458 B.R. 665 (S.D.N.Y. 2011)............................................................18

*In re Fearn*,
   96 B.R. 135 (Bankr. S.D. Ohio 1989)......................................................................33

*In re Glitnir Banki HF*,
   No. 08-14757 (SMB), 2011 WL 3652764 (Bankr. S.D.N.Y. Aug. 19, 2011).......19, 21, 30, 33

*In re Golden Sphinx*,
   No. 22-14320 (NWB), 2023 WL 2823391 (Bankr. C.D. Cal. Mar. 31, 2023)................22, 23

*In re Hilsen*,
   No. 87-11261 (JMP), 2008 WL 2945996 (Bankr. S.D.N.Y. July 25, 2008) ..........................19

*In re Ion Media Networks, Inc.*,
   419 B.R. 585 (Bankr. S.D.N.Y. 2009)....................................................................26

*In re Ionosphere Clubs, Inc.*,
   156 B.R. 414 (Bankr. S.D.N.Y. 1993)....................................................................20

*In re JSC BTA Bank*,
   434 B.R. 334 (Bankr. S.D.N.Y. 2010).......................................................18, 19, 23

*In re LightSquared Inc.*,
   504 B.R. 321 (Bankr. S.D.N.Y. 2013)....................................................................22

*In re Metiom, Inc.*,
   318 B.R. 263 (Bankr. S.D.N.Y. 2004).......................................................19, 29, 30

*In re MF Global Holdings Ltd.*,
   465 B.R. 736 (Bankr. S.D.N.Y. 2012)....................................................................22

*In re Millennium Global Emerging Credit Master Fund Ltd.*,
   471 B.R. 342 (Bankr. S.D.N.Y. 2012)....................................................................21

*In re Mittco, Inc.*,
   44 B.R. 35 (Bankr. W.D. Wis. 1984)....................................................................27

*In re OAS Fin. Ltd.*,
   No. 15-11304 (SMB) (Bankr. S.D.N.Y. June 23, 2015) [Docket No. 43] ............................24

*In re Platinum Partners Value Arbitrage Fund L.P.*,
   583 B.R. 803 (Bankr. S.D.N.Y. 2018)....................................................................23

*In re Serignese*,
   No. 19-10724 (JLG), 2019 WL 2366424 (Bankr. S.D.N.Y. June 3, 2019)............................19

*In re Standing Order of Reference Re: Title 11*,
12 Misc. 00032 (S.D.N.Y. Feb. 1, 2012) (Preska, C.J.) ........................................................18

*In re SunEdison, Inc.*,
562 B.R. 243 (Bankr. S.D.N.Y. 2017) ................................................................29, 31, 32, 33

*In re Symington*,
209 B.R. 678 (Bankr. D. Md. 1997) ....................................................................................19

*In re Wilson*,
No. 07-11862 (EWM), 2009 WL 304672 (Bankr. E.D. La. Feb. 6, 2009)............................19

*Intel Corp. v. Advanced Micro Devices, Inc.*,
542 U.S. 241 (2004)..............................................................................................................31

*Kiobel by Samkalden v. Cravanth, Swaine & Moore, LLP*,
895 F.3d 238 (2d Cir. 2018)..................................................................................................30

*Krys v. Paul, Weiss, Rifkind, Wharton & Garrison, LLP (In re China Med. Techs., Inc.)*,
539 B.R. 643 (S.D.N.Y. 2015)..............................................................................................23

*Lange v. Citibank, N.A.*,
No. 19245 (LES) 2002 WL 2005728 (Del. Ch. Ct. Aug. 13, 2002)......................................26

*Martin v. Schaap Moving Sys.*,
No. 97-5042 (PNL), 1998 U.S. App. LEXIS 15255 (2d. Cir. Apr. 21, 1998).......................27

*Penades v. Republic of Ecuador*,
2016 WL 5793412 (S.D.N.Y. 2016) ....................................................................................25

*Snyder v. Society Bank*,
181 B.R. 40 (S.D. Tex. 1984), *aff'd sub nom. In re Snyder*, 52 F.3d 1067 (5th
Cir. 1995) ..............................................................................................................................28

## STATUTES AND RULES

11 U.S.C. § 105.......................................................................................................1, 22, 23

11 U.S.C. § 541(a) .........................................................................................................19

11 U.S.C. § 1509..............................................................................................................1

11 U.S.C. § 1515..............................................................................................................1

11 U.S.C. § 1517..............................................................................................................1

11 U.S.C. § 1519..............................................................................................................9

11 U.S.C. § 1520 ................................................................................................................1, 9

11 U.S.C. § 1521 ....................................................................................................1, 20, 21, 31

28 U.S.C. § 157 ..........................................................................................................................18

28 U.S.C. § 1334 ........................................................................................................................18

28 U.S.C. § 1410 ........................................................................................................................18

28 U.S.C. § 1782 ........................................................................................................30, 31, 32

28 U.S.C. § 2075 ........................................................................................................................20

Fed. R. Bankr. P. 2004 ................................................................................................ passim

### MISCELLANEOUS

Andre Romani, *Americanas Espera Assembleia De Credores Sobre Plano De Recuperacao Judicial Ainda Em 2023* [Americanas Expects Creditor's Meeting Still In 2023], TERRA (October 27, 2023), https://www.terra.com.br/economia/americanas-espera-assembleia-de-credores-sobre-planode-recuperacao-judicial-ainda-em-2023,a636476dfcd57a09fa813dabea6a6f7e4ie8pu7x.html ......................................................4

Rodrigo Carro, *Assembleia De Credores Da Americanas Deve Ocorrer Em Agosto, Diz Fonte* [Americanas' Creditor's Meeting Should Take Place In August, Says Source], VALOR (July 16, 2023), t https://valor.globo.com/empresas/noticia/2023/07/16/assembleia-de-credores-da-americanas-deve-ocorrer-emagosto-diz-fonte.ghtml ............................................................4

Antonio Reinaldo Rabelo Filho (the "**Foreign Representative**"), the duly-authorized foreign representative of Americanas S.A. ("**Americanas**"), JSM Global S.à.r.l. ("**JSM Global**"), and B2W Digital Lux S.à.r.l. ("**B2W Digital**," together with Americanas and JSM Global, the "**Chapter 15 Debtors**") in the jointly-administered judicial reorganization (*recuperação judicial* or "**RJ**") proceeding (the "**Brazilian RJ Proceeding**") of the Chapter 15 Debtors and certain of their affiliated debtors (the "**Americanas Group**" or the "**RJ Debtors**"), pursuant to a precautionary lawsuit filed on January 12, 2023 subsequently amended on January 19, 2023 pursuant to Federal Law No. 11.101 of February 9, 2005 (as modified, the "**Brazilian Bankruptcy Law**"), of the laws of the Federative Republic of Brazil ("**Brazil**"), pending before the 4th Business Court of Rio de Janeiro (the "**Brazilian RJ Court**"),[1] by and through his undersigned counsel, respectfully submits this objection (the "**Objection**") to the *Motion of Sablon Partners Ltd. for Entry of an Order Pursuant to Bankruptcy Rule 2004 Authorizing the Examination of Debtors Americanas and B2W Digital and Third Parties* [Docket No. 42-1] (the "**Motion**").[2]  In support of this Objection, the Foreign Representative respectfully states as follows:[3]

## **PRELIMINARY STATEMENT**

1.      Through the Motion, Sablon Partners Ltd. ("**Sablon**"), a small B.V.I. creditor owned by a Brazilian individual that allegedly holds only US$1 million out of US$1 billion of unsecured notes, seeks to use Rule 2004 of the Federal Rules of Bankruptcy Procedure ("**Rule**

---

[1]    The case number for the Brazilian RJ Proceeding before the Brazilian RJ Court is 0803087-20.2023.8.19.0001.

[2]    Capitalized terms used but not defined herein have the meanings ascribed to them in the Motion or the Petitioner's Declaration and Verified Petition for Recognition of the Brazilian RJ Proceeding and Motion for Order Granting Related Relief Pursuant to 11 U.S.C. §§ 105(a), 1509, 1515, 1517, 1520, and 1521 [Docket No. 3] (the "**Verified Petition**").

[3]    In further support of this Objection, the Foreign Representative relies upon and incorporates by reference the Declaration of the Foreign Representative in Support of the Foreign Representative's Objection to Motion of Sablon Partners Ltd. for Entry of an Order Pursuant to Bankruptcy Rule 2004 Authorizing the Examination of Debtors Americanas and B2W Digital and Third Parties (the "**Foreign Representative Declaration**") and Declaration of Francisco Satiro in Support of the Foreign Representative's Objection to Motion of Sablon Partners Ltd. for Entry of an Order Pursuant to Bankruptcy Rule 2004 Authorizing the Examination of Debtors Americanas and B2W Digital and Third Parties (the "**Brazilian Law Declaration**"), filed substantially contemporaneously herewith.

**2004**") to obtain broad discovery from two of the Chapter 15 Debtors and certain non-debtor third parties (the "**Reference Shareholders**"). Sablon's request is truly unprecedented. Although it attempts to characterize its Motion as customary, no U.S. court has ever granted such extensive discovery to a single creditor in a chapter 15 case under Rule 2004. Indeed, this Court and others have ruled that such a request amounts to an impermissible and collateral "fishing expedition."

2.      Sablon appears to fundamentally misunderstand the limited nature of these Chapter 15 Cases. The restructuring of the Chapter 15 Debtors is occurring in Brazil under the supervision of the Brazilian RJ Court, which this Court has recognized as the Chapter 15 Debtors' foreign main proceeding; these Chapter 15 Cases are ancillary to that insolvency process. The application of Rule 2004 is thus limited in chapter 15 cases, with the weight of authority limiting Rule 2004 discovery to the requests of a foreign representative where the U.S. court's assistance to a foreign main proceeding is required. Accordingly, the Motion should be denied on multiple bases.

3.      First, the Motion is neither limited in nature nor appropriate given the Court's ancillary chapter 15 jurisdiction. Sablon seeks broad discovery regarding alleged misconduct involving Brazilian parties that occurred in Brazil. The relevant information can be and has been sought in Brazil. In fact, the only connection to the United States that Sablon can identify is the issuance of New York law-governed Regulation S Rule 144A bonds (issued by a Luxembourg company) and certain Delaware affiliates of the Reference Shareholders. More importantly, the matters on which Sablon seeks to obtain information do not relate to any issues under chapter 15, such as recognition of the foreign proceeding, enforcement of orders by the foreign court, or property located in the U.S. As such, this discovery should be sought in Brazil—which Sablon concedes it could have done but has not.

2

4.      Second, Rule 2004 discovery in a chapter 15 case is limited to requests by a foreign representative seeking the chapter 15 court's assistance in connection with the foreign main proceeding.  Creditors like Sablon are not permitted to use Rule 2004 to seek broad discovery from the Chapter 15 Debtors or other parties.   None of the cases cited by Sablon allow for such discovery.  In the one out of circuit case cited in the Motion suggesting this is possible the court denied a creditor's request for Rule 2004 discovery and made clear that such discovery is not permissible where (as is the case here) there is no pending contested matter and it would not assist the foreign main proceeding

5.      Third, the requested discovery would not, as Sablon suggests, aid or assist the Chapter 15 Debtors' foreign main proceeding.  Neither the Brazilian RJ Court, the Judicial Administrator, nor any other creditor has requested similar assistance from this Court because no such help is required.  Rather, the Motion is Sablon's effort to sidestep the Brazilian legal system and supplant it with the U.S. discovery process to advance its own interests.  Sablon makes no attempt to hide its intentions, admitting in its letter dated November 30, 2023 [Docket No. 50] (the "**November 30 Letter**") that it wants to use the proposed Rule 2004 discovery to lobby creditors attending the general meeting of creditors on December 19, 2023 (*assembleia geral de credores*, or "**AGC**").  But Rule 2004 is not a tool for a single small creditor to impose discovery rules from the U.S. legal system on a foreign debtor, nor is it a mechanism to embark on a collateral discovery expedition that would undermine the orderly administration of a recognized foreign main proceeding.  It is also unclear how Sablon would even use the proposed discovery in the Brazilian

3

RJ Proceeding as Sablon has not even taken the minimal steps needed to participate in the upcoming AGCs.[4]

6.      Fourth, the discovery sought in the Motion should also be denied as Sablon is subject to contractual provisions under the JSM Indenture that prevent it from initiating legal actions or otherwise bringing any claims against the Chapter 15 Debtors or other parties with respect to its NY Notes.

7.      Fifth, the request for discovery also should be denied because Sablon is able to seek the requested information in Brazil (just as other creditors have).  The use of Rule 2004 constitutes abuse and harassment when, as here, the movant had an opportunity to "explore the issues raised" by other means but did not do so.  Nor can Rule 2004 be used by Sablon in an effort to interfere with the Brazilian RJ Proceedings or to manufacture claims for Sablon to assert in other Brazilian courts outside of the Brazilian RJ Proceeding.

8.      Sixth, and in any case, Sablon has failed to demonstrate the necessary "good cause" to obtain Rule 2004 discovery.  Rather, the requested discovery is unnecessary, duplicative of procedures already underway in Brazil, and would be disproportionately burdensome to the Chapter 15 Debtors.  Sablon itself could not use the proposed discovery for any legitimate purpose (let alone one consistent with chapter 15) as it lacks standing to bring many of the purported claims it identifies both statutorily under applicable Brazilian law and contractually under the no-action clause in the JSM Indenture.  Moreover, the alleged fraud is already the subject of a number of

---

[4]     Creditors have known that the AGC will be held prior to the end of the year since at least July 2023.  *See, e.g.*, Rodrigo Carro, *Assembleia De Credores Da Americanas Deve Ocorrer Em Agosto, Diz Fonte* (Americanas' Creditor's Meeting Should Take Place In August, Says Source), VALOR (July 16, 2023), https://valor.globo.com/empresas/noticia/2023/07/16/assembleia-de-credores-da-americanas-deve-ocorrer-emagosto-diz-fonte.ghtml; Andre Romani, *Americanas Espera Assembleia De Credores Sobre Plano De Recuperacao Judicial Ainda Em 2023* (Americanas Expects Creditor's Meeting Still In 2023), TERRA (October 27, 2023), https://www.terra.com.br/economia/americanas-espera-assembleia-de-credores-sobre-planode-recuperacao-judicial-ainda-em-2023,a636476dfcd57a09fa813dabea6a6f7e4ie8pu7x.html.

investigations and inquiries in Brazil, including an internal investigation by the Americanas' board

of directors and an investigation ordered by the Brazilian RJ Court in the Brazilian RJ Proceeding.

Other creditors and governmental entities have also commenced independent investigations to

determine the potential criminal and civil liability of implicated parties related to the alleged fraud.

9.      Finally, any purported benefit of the broad discovery sought by Sablon would be

materially outweighed by the significant burdens placed on the Chapter 15 Debtors.  The proposed

Rule 2004 discovery would divert the Chapter 15 Debtors' attention from the Brazilian RJ

Proceeding at a critical juncture in the case—i.e., the AGC and RJ Plan approval process—and

needlessly consume valuable.  Nor would the burdens associated with Sablon's proposed discovery

be proportional given Sablon small holdings (only US$1 million of the US$1 billion of NY Notes

and a miniscule amount of the Americanas Group's total indebtedness) and expected recoveries

under the RJ Plan.

10.     Thus, for these reasons and as further explained herein, this Court should deny

Sablon's Motion.

## **BACKGROUND**

11.     The Americanas Group is one of the largest retailers in Brazil that provides a broad

range of goods and services to the country's general population.  Verified Pet. ¶ 9.  The Americanas

Group includes (1) the three Chapter 15 Debtors, including Americanas, the parent company in

Brazil, and its two wholly-owned subsidiaries based in Luxembourg, B2W Digital and JSM

Global; and (2) one RJ Debtor that is not a Chapter 15 Debtor—ST Importações Ltda.[5]  *Id.* ¶ 14.

Additional information about the Chapter 15 Debtors' businesses and affairs, capital structure and

---

[5]     ST Importações Ltda., the remaining RJ Debtor, was not included as a chapter 15 debtor because it did not own assets in the United States, it did not owe debts governed by U.S. law, or otherwise have any significant ties to the United States that would require the protection of this Court.

prepetition indebtedness, and the events leading to the chapter 15 petition, can be found in the Verified Petition.

### A.    The Americanas Group's Business and Shareholders Are Centered in Brazil

12.    The Americanas Group's business activities are primarily located in Brazil. *Id.* ¶ 14. In recent years, the Americanas Group's online businesses started to expand into certain Latin American countries, including Mexico, Chile, and Argentina. *Id.* The Americanas Group has not expanded to the United States. *Id.*; Foreign Representative Decl. ¶ 5. Further, while B2W Digital and JSM Global are Luxemburg-based subsidiaries, they do not engage in any business other than to support Americanas' business in Brazil exclusively as special purpose entities formed to issue the NY Notes, which is common practice for Brazilian companies accessing international debt markets. Verified Pet. ¶¶ 17- 18; Foreign Representative Decl. ¶ 5; *see also* Recognition Order (as defined below) ¶¶ J, 3–4. Notably, none of the Chapter 15 Debtors have any offices or businesses in the United States. Foreign Representative Decl. ¶ 5.

13.    Americanas is a publicly-held corporation and its stocks are traded on B3, a stock exchange located in São Paulo, Brazil. Foreign Representative Decl. ¶ 6. Approximately 69.88% of its shares are held by thousands of different parties (the vast majority of whom are located in Brazil), and approximately 30.12% of the shares of the Americanas Group are collectively held, directly or indirectly, by three Brazilian individuals, Jorge Paulo Lemann, Marcel Herrmann Telles, and Carlos Alberto da Veiga Sicupira (the "**Reference Shareholders**"), none of whom resides in the United States. *Id.*

### B.    Events Leading to the Filing of the RJ Proceeding Occurred in Brazil

14.    Prior to the discovery of certain accounting inconsistencies, the Americanas Group had been a financially healthy enterprise, generating substantial revenue, employing over 30,000

6

people and paying more than R$2.930 billion in taxes.[6]  *Id.* ¶ 7.  Entering 2023, Americanas

identified certain miscategorizations of certain purchase financing debts as debts owed to suppliers

in its financial statements from previous years.  *Id.* ¶ 8; Verified Pet. ¶ 4.  On January 11, 2023,

Americanas published a "material fact" notice as required under Brazilian securities regulations

(the "**January 11 Material Fact**"), informing the public that it detected inconsistencies in

accounting entries that reduced the balance in the suppliers account related to previous fiscal years

Foreign Representative Decl. ¶ 8; Verified Pet. ¶ 4.  Along with the disclosure of the January 11

Material Fact, on January 11, 2023, Americanas' former CEO Sérgio Rial and investor relations

officer André Covre tendered their resignations.  Foreign Representative Decl. ¶ 8; Verified Pet. ¶

30.  The board of directors of Americanas immediately formed an independent investigation

committee (the "**Independent Committee**") to fully investigate and analyze the circumstances in

which such accounting circumstances occurred.  Foreign Representative Decl. ¶ 8; Verified Pet. ¶

30.

15.    The publication of the January 11 Material Fact and the revelation of the accounting

inconsistencies triggered various Brazilian lenders to send notices of default and acceleration of

their claims, freeze or setoff funds, and request the immediate repayment of the outstanding

balance of their claims, resulting in the Americanas Group filing for the Brazilian RJ Proceeding

on an emergency basis on January 19, 2023.  Foreign Representative Decl. ¶ 9.

## C.    The NY Notes

16.    The Chapter 15 Debtors are obligors under two series of unsecured notes

denominated in U.S. Dollars (collectively, the "**NY Notes**" and its holders, the "**Noteholders**"),

---

[6]    As reflected in the newly published earnings presentation released on November 16, 2022, the net revenue of 2022 was
R$22.809 billion, and the gross profits were R$5.024 billion.  Recently the financial statements have been revised
retrospectively, accounting for the findings identified by the current management.

with an aggregate principal amount of US$1 billion (plus accrued interest) and governed by New York law indentures (collectively, the "**Indentures**"), which were automatically accelerated upon the filing of the Brazilian RJ Proceeding. *Id*. ¶ 20. The terms of the NY Notes, in relevant part, are as follows:

(1)    **4.375% Notes due 2030**: The senior notes issued by B2W Digital in the aggregate principal amount of US$500,000,000 (the "**B2W Digital Notes**"), which are governed by that certain Indenture dated as of November 24, 2020 (the "**B2W Indenture**") by and between B2W Digital, as issuer, B2W – Companhia Digital (later acquired by Americanas), as guarantor, and Deutsche Bank Trust Company Americas ("**Deutsche Bank**" or "**Indenture Trustee**") as trustee, registrar, paying agent, and transfer agent. The B2W Digital Notes mature on December 20, 2030 and are guaranteed by Americanas.

(2)    **4.750 % Notes due 2030**: The senior notes issued by JSM Global in the aggregate principal amount of US$500,000,000 (the "**JSM Global Notes**"), which are governed by that certain Indenture dated October 6, 2020 (the "**JSM Indenture**" and together with the B2W Indenture, the "**Notes Indentures**") by and between JSM Global, as issuer, Americanas, as guarantor, and Deutsche Bank, as trustee, registrar, paying agent, and transfer agent. The JSM Global Notes mature October 20, 2030 and are guaranteed by Americanas.

17.    Of particular interest is that Section 6.06 of the JSM Indenture (and, for reference, of the B2W Indenture as well) expressly prohibits the holders of JSM Global Notes from instituting any legal proceedings with respect to the notes without first complying with certain pre-conditions (the "**No-Action Clause**"). Foreign Representative Decl., Ex. B (JSM Indenture) § 6.06. The No-Action Clause provides that "[a] holder may not institute any proceeding, judicial or otherwise, with respect to this Indenture or the Notes, or for the appointment of a receiver or trustee, or for any other remedy under this Indenture or the Notes", unless:

(i)    The Holder has previously given to the Trustee (defined under the JSM Indenture) written notice of a continuing Event of Default (defined under the JSM Indenture);

(ii)    Holders of at least 25% in aggregate principal amount of Outstanding Notes (defined under the JSM Indenture) have made written request to the Trustee to institute such proceedings in respect

of the Event of Default in its own name as Trustee under this Indenture;

(iii)    Holders have offered to the Trustee indemnity reasonably satisfactory to the Trustee against any costs, liabilities or expenses (including, without limitation, fees and expenses of agents and attorneys) to be incurred in compliance with such request;

(iv)    The Trustee for 60 days after its receipt of such notice, request and offer of indemnity has failed to institute any such proceeding; and

(v)    The Holders of a majority in aggregate principal amount of the Outstanding Notes have not given the Trustee a direction that is inconsistent with such written request.

The exception to the No-Action Clause, however, is Section 6.07, which provides that the rights of the relevant Noteholders to "to receive payment of principal of or interest . . . or to bring suit for the enforcement of any such payment . . . may not be amended" are preserved.[7]

18.    Sablon has not shown, and the Foreign Representative is not aware of, any written notice submitted to the Indenture Trustee that complies with the No-Action Clause or which would authorize Sablon to bring any claims or initiate any judicial actions related to the JSM Global Notes.[8]

**D.    The Chapter 15 Proceeding**

19.    The Chapter 15 Debtors commenced these Chapter 15 Cases primarily to receive stay protection under sections 1519 and 1520 of the Bankruptcy Code against potential creditor action under the NY Notes.

---

[7]    Section 6.07 of the JSM Indenture provides that "[n]otwithstanding anything to the contrary, the contractual right of a Holder of a Note to receive payment of principal of or interest on its Note on or after the Stated Maturity thereof, or to bring suit for the enforcement of any such payment on or after such respective dates, in each case as expressly set forth in this Indenture, may not be amended without the consent of that Holder."

[8]    While the discovery sought and the various avoidance and/or fraud actions contemplated in the Motion are related to the JSM Indenture, Sablon does not prosecute the Motion to enforce the amounts owed only to Sablon.

9

20.     On January 25, 2023, the Foreign Representative filed a Verified Petition with this Court seeking recognition of the Brazilian RJ Proceeding as the foreign main proceeding of the Chapter 15 Debtors. *See* Verified Petition. Contemporaneously, the Foreign Representative filed the *Motion for Provisional Relief under 11 U.S.C. Section 1519 ,1521(a)(7), 105(a) and 362* [Docket No. 5] (the "**Provisional Relief Motion**"), seeking the provisional stay relief in the United States, which this Court granted on January 27, 2023. *See* Docket No. 17.

21.     On March 3, 2023, the Court held a hearing to consider the Verified Petition and recognized the Brazilian RJ Proceeding as a "foreign main proceeding" for each of the Chapter 15 Debtors. *See* Docket No. 32 (the "**Recognition Order**"). The Recognition Order specifically finds that the center of main interest of each of the Chapter 15 Debtors is in Brazil. Recognition Order ¶ J.

### E.     Ongoing Investigation Proceedings

22.     Since the discovery of the accounting inconsistencies, various investigations have taken place in Brazil, including an internal investigation by the Independent Committee appointed by Americanas' board of directors, three separate investigations initiated by the Brazilian government, and one judicial investigation ordered by Brazilian RJ Court. Foreign Representative Decl. ¶¶ 23–29. Further, creditors of Americanas, including Bradesco S.A. ("**Bradesco**")—Americanas' largest bank lender—have sought and obtained discovery in other Brazilian courts related to the inconsistencies in parallel with the Brazilian RJ Proceeding. Foreign Representative Decl. ¶¶ 30–31. To date, however, Sablon has not requested discovery from Americanas in any court except in this Court, nor asserted any claims or sought any relief against the Americanas Group and the Reference Shareholders. *Id.* ¶ 35.

## F.    Investigation by the Independent Committee

23.    The Americanas Group has proactively undertaken an extensive investigation into the accounting inconsistencies which led to its financial crisis.  Following receipt of certain relevant documents presented by the Independent Committee and its analysis by Americanas' attorneys, along with other evidence that Americanas identified, Americanas issued two "material fact" notices on June 13, 2023 ("**June 13 Material Fact**") and June 14, 2023 ("**June 14 Material Fact**") detailing the results of the investigations.  *Id.* ¶ 23.

24.    Specifically, Americanas disclosed certain specific irregular conduct by the former officers, including: (1) artificial creation of advertising budget agreements and similar contracts that "reduced" costs without actual contracts with any suppliers; and (2) entry into financial arrangements without proper corporate approvals, such as incurring purchase financing obligations and certain working capital financing obligations.  These transactions were incorrectly recorded on the "suppliers' account," resulting in inaccurate records of the indebtedness level over time.  *Id.* The June 13 Material Fact clearly stated that "the Company's financial statements were being fraudulently altered by the previous board of officers of Americanas . . . the previous board of officers of Americanas [hid] from the Board of Directors and the market in general the real situation of the Company's results and assets," and that the improper accounting resulted in incorrect "determination of the Company's indebtedness level over time."  *Id.*

25.    The June 13 Material Fact identified the individuals—all now former employees— responsible for the irregularities, including: (1) former CEO Miguel Gutierrez,[9] (2) former officers Anna Christina Ramos Saicali, José Timótheo de Barros[10] and Márcio Cruz Meirelles, and (3)

---

[9]    Miguel Gutierrez was removed from the office on December 31, 2022.  *Id.* ¶ 24.

[10]    José Timótheo de Barros was removed from his executive duties on February 3, 2023.  *Id.* ¶ 24.

former executives Fábio da Silva Abrate, Flávia Carneiro and Marcelo da Silva Nunes (collectively, the "**Implicated Parties**").[11]  *Id.*

26.    The Implicated Parties caused an inaccurate increase in Americanas' income by R$25.3 billion and a "decrease" in gross financial debt by R$20.6 billion.  *Id.* ¶ 25.[12]  None of the Implicated Parties resides in the United States or has any specific connection to the United States, all of the alleged conduct at issue—the accounting irregularities, including the unauthorized incurrence of financial obligations, the artificial creation of supplier contracts, and the fraudulent alternations of financial statements—occurred at the headquarters of Americanas in Brazil, and all of the relevant records are maintained in Brazil.  *Id.*  None of the Implicated Parties has any specific connections to the United States.  *Id.*

## G.    Government-Led Investigations

27.    Among others, there are at least three government-sponsored investigations relating to the accounting inconsistencies also taking place in Brazil: (1) the investigation conducted by the CVM (Comissão de Valores Imobiliários—Brazil's equivalent to the United States Securities and Exchange Commission) ("**CVM Investigation**"); (2) the investigation conducted by the Brazilian Parliamentary Inquiry Commission ("**CPI**"), a sector of the Brazil's Congress (the "**CPI Investigation**"); and (3) the investigation conducted by the Federal Prosecutors Office and the Brazilian Federal Police (the "**Federal Prosecutors Investigation**").  *Id.* ¶ 28.

    (a)    ***CVM Investigation***: The CVM regulates Brazil's capital market and sanctions behaviors that violate corporate and securities laws, as well as to its violations of its regulations.  The CVM initiated several investigations against Americanas, its board members, fiscal council members, board committees members, officers, including a majority of the Implicated Parties, and the independent auditors for the accounting

---

[11]    Anna Christina Ramos Saicali, Mr. Márcio Cruz Meirelles, Mr. Fábio da Silva Abrate, Mrs. Flávia Carneiro and Mr. Marcelo da Silva Nunes were all removed from their executive duties in the Company since February 3, 2023.  *Id.* ¶ 24.

[12]    The "fraud architecture" was also analyzed in the earnings presentation released by Americanas on November 16, 2023.  *Id.* ¶ 27a.

inconsistencies, misstatements in financial statements, lack of compliance with fiduciary duties and the surrounding circumstances. The CVM Investigation remains ongoing.[13] Foreign Representative Decl. ¶ 27a

(b)    *CPI Investigation*: The CPI is part of the legislative branch of the Brazilian government with broad investigative powers. Generally, the CPI has a limited mandate to investigate a particular matter for 120 days, subject to further renewal. Upon the conclusion of the investigation, the CPI may produce a report and make recommendations to the Brazilian Public Prosecutor's Office to take necessary measures to identify or punish wrongdoers. The CPI commenced an investigation against Americanas, and the mandate for its investigation expired on September 26, 2023.[14] Americanas' current CEO Leonardo Coelho, who was appointed after the initial reports of accounting issues, was invited to speak and fully collaborated with the CPI. At that time, Mr. Coelho stated that Americanas is fully committed and available to collaborate in any investigation held by the competent authorities. Consequently, Americanas also provided all information and documents it had under its control to the CPI, while replying to several information and documents requests. The Implicated Parties who were summoned to depose before the CPI did not collaborate with the investigations held by the CPI. In its final report, the CPI identifies Americanas' former officers and directors (including the Implicated Parties) as potentially involved in the misconduct, but concluded that the evidence gathered up to that point was insufficient to recommend indictments. The CPI determined that it was not possible for the CPI to identify precisely who was responsible for the misconduct and that all the information and evidence gathered by the CPI would assist with the investigation currently underway by other competent authorities. Foreign Representative Decl. ¶ 27b.

(c)    *Federal Prosecutors Investigation*: The Federal Prosecutors Office in Brazil is currently investigating potential crimes committed in relation to the accounting inconsistencies, willful misstatements in financial statements, and other crimes against the popular economy and the securities markets. During his deposition before the CPI, Federal Prosecutor, Mr. José Maria Castro Panoeiro, stated that investigations were advanced and that some of the people who were assisting the investigation were negotiating leniency agreements with the Federal Prosecutors Office. If such agreements were reached, they shall be kept confidential under Brazilian law and may only be made public upon a decision by the competent court. Americanas has not been a part of any such agreements and has no knowledge of the contents of any such agreement. The Federal Prosecutors Office Investigation remains ongoing. Foreign Representative Decl. ¶ 27c.

## H.    The Brazilian RJ Investigation

---

[13]    On November 8, 2023, B3 suspended Americanas from the Novo Mercado segment for an indefinite period of time and sanctioned Americanas and several of its former and current directors for breaches committed after the Material Fact dated January 11, 2023. Americanas will be appealing the sanctions.

[14]    The CPI is tasked with investigating the issues and proposing legislative improvements to inhibit other occurrences such as the one that took place in Americanas.

28.    On February 9, 2023, the Brazilian RJ Court also ordered an investigation (the "**RJ Investigation**") into the accounting inconsistencies that had led to commencement of the Brazilian RJ Proceeding.  *Id.* ¶ 28.   The RJ Investigation was conducted by the judicial administrator ("**J.A.**"), who was appointed by the Brazilian RJ Court to assist in monitoring the RJ Debtors' business activities and assessing the claims subject to the Brazilian RJ Proceeding.  *Id.*  After reviewing "85 portfolio of documents, divided into 294 files . . . totaling more than 38,000 working papers," the J.A. published a 452-page report covering various aspects of the accounting inconsistencies, Americana's financial stability and assessing the possibility to successfully emerge from the Brazilian RJ Proceeding (the "**J.A. Report**").  *Id.*

## I.    Discovery by Brazilian Creditors

29.    Creditors in Brazil have also initiated discovery against the Chapter 15 Debtors related to the alleged fraud and accounting irregularities.   Five creditors (Bradesco, Banco Santander, Itaú Unibanco, Banco Safra, and Caixa Econômica) have requested discovery from the Chapter 15 Debtors related to the alleged fraud and accounting irregularities, three of which were granted by the Brazilian courts (Bradesco, Banco Santander, and Caixa Econômica). *Id.* ¶ 33.  Due to negotiations between the parties, each of these discovery efforts has been suspended.

30.    Prior to the suspensions, and as a result of Bradesco's and Banco Santander's discovery requests, thousands of documents have been produced before Brazilian courts.  *Id.* ¶ 31. Bradesco's request for accounting and forensic expertise was sought under articles 381–389 and 369–401 of the Civil Procedure Code, and Banco Santander's request for the search and seizure of Americanas' e-mails was sought under articles 381, I and III, and 389, of the Civil Procedure Code.

## J.    Recent Developments in the Brazilian RJ Proceeding and Negotiations with Creditors Toward a Consensual Plan

31.    At the beginning of 2023, Americanas' financial situation deteriorated quickly and the Americanas Group encountered a severe risk of liquidation. *Id.* ¶ 10. Consequently, the Reference Shareholders agreed to provide a two-tranche unsecured debtor-in-possession financing of R$2 billion ("**DIP Financing**"). *Id.* The purpose of the DIP Financing was to support Americanas' normal course of business, providing the necessary liquidity for its operations, maintain the working capital investments and make timely payments to suppliers and vendors. *Id.*

32.    On February 9, 2023, the DIP Financing was approved by the Brazilian RJ Court. *Id.* ¶ 11. Subsequently, the Reference Shareholders funded R$1 billion under the first tranche of the DIP. *Id.* The Reference Shareholders funded the second tranche of the DIP Financing in the amount of R$500.632 million and received certain common debentures in exchange. *Id.* Although Americanas extended the right to take part in the DIP Financing to all of its creditors, no creditor expressed an interest in funding its activities under such facility. *Id.*

33.    The RJ Debtors filed their initial plan in the Brazilian RJ Proceeding on March 20, 2023 (the "**Initial RJ Plan**"), as required by Brazilian law. *Id.* ¶ 12. Following the filing of the Initial RJ Plan, the Americanas Group engaged in more than half a year of extensive negotiations with various creditor groups, including its bank creditors,[15] to reach an agreement on a consensual plan that would improve the proposed payments and maximize the recovery to all creditors. *Id.* On July 11, 2023, the Brazilian RJ Court entered an order extending the stay against creditor action in the Brazilian RJ Proceeding until January 7, 2024, to allow the Americanas Group to continue negotiations with its creditors. *Id.*

---

[15]    The bank creditors include Bradesco (holder of a claim in the amount of R$5.1 billion), Santander (R$3.6 billion), BTG Pactual (R$3.5 billion), Banco Vatorantim (R$206 million), Itau Unibanco (R$2.7 billion), Safra (R$2.5 billion), Bando de Brasil (R$1.3 billion) and Caixo Económica Federal (R$501 million) (collectively, the "**Bank Creditors**"), with total claims of approximately R$(19,407,000), accounting for nearly 50% of the total debts of the Americanas Group. *Id.* ¶ 12.

34.     Ultimately, on November 27, 2023, the Americanas Group, the Reference Shareholders, and creditors holding more than 35% of its debt (excluding intercompany credits) ("**Supporting Creditors**")[16] executed a plan support agreement (the "**PSA**") regarding the proposed restructuring transactions in a revised RJ Plan (the "**RJ Plan**").  *Id.* ¶ 13.  Certain other creditors who participated in the negotiation process (the "**Additional Creditors**") have also indicated their interest in joining the PSA and are seeking internal approval to sign onto the PSA. *Id.*  The Additional Creditors and the Supporting Creditors together represent more than 50% of Americanas' prepetition debt, which shall be sufficient to approve the RJ Plan under the Brazilian Bankruptcy Law.  *Id.*  The Americanas Group filed the RJ Plan in court on November 27, 2023. *Id.*

35.     The creditors subject to the Brazilian RJ Proceeding who satisfy the registration requirements pursuant to the Brazilian Bankruptcy Law will have the opportunity to vote at the AGC on whether to accept or reject the RJ plan.  *Id.* ¶ 14.  Given the fact that the NY Notes are freely tradeable in securities markets and the Noteholders are not immediately identifiable by the RJ Debtors, the claims arising out of the NY Notes are listed in the Americanas Group's creditor matrix as held by the Indenture Trustee.  Brazilian Law Decl. ¶ 9.  Noteholders may direct the Indenture Trustee to cast votes on their behalf at the AGC, but also may request the individualization of their claims in the creditor matrix, so they can participate and vote independently at the AGC.  To individualize their claims, Noteholders were required to satisfy, by November 29, a separate and specific registration procedure as ordered by the Brazilian RJ Court on October 3, 2023.  *Id.*  Sablon has not complied with the individualization procedure and

---

[16]     The Supporting Creditors include Banco Bradesco S.A., Itau Unibanco S.A., Itau Unibanco S.A. Nassau Branch, Banco Santander (Brasil S.A.), Banco BTG Pactual S.A and BTG Pactual Seguros S.A.  *Id.* ¶ 13.

accordingly will not be allowed to participate in the AGCs.  Foreign Representative Decl. ¶ 35; Brazilian Law Decl. ¶ 11.

36.    The RJ Plan consists of 3 classes: Class 1—labor related claims in the amount of approximately R$82.9 million; Class 3—unsecured claims from financial creditors in the amount of R$42.3 billion, including the NY Notes, and claims from suppliers of R$5.5 billion; and Class 4—claims from micro or other small companies in the amount of R$180.2 million.  *Id.* ¶ 15. Creditors in Class 1 and Class 4 will receive full recovery in cash within 30 days following the approval of the RJ Plan.  *Id.*  Class 3 creditors with claims up to R$12,000 may elect to receive full payment of their claims in cash within 60 days following the approval of the RJ Plan.  *Id.* Class 3 creditors with claims exceeding R$12,000 may elect to receive their pro rata share of R$40 million in cash options.  *Id.* ¶¶ 15–16.  Claimants who, among other situations, fail to otherwise affirmatively select another payment plan option shall receive an 80% haircut, with payment to be made in a single bullet repayment on January 31, 2044.  *Id.*  The RJ Plan additionally designates specific recovery amounts for various suppliers.[17]  *Id.* ¶ 17.

37.    Additionally, under the PSA, the Americanas Group will issue new shares amounting to R$12 billion to the Reference Shareholders, in exchange for the amounts lent under the DIP Financing and additional new equity contributions that the Reference Shareholders have agreed to provide under the PSA.  *Id.* ¶ 18.  The Americanas Group will also issue shares totaling up to R$12 billion to other creditors, who agree to equitize their claims under the RJ Plan.  *Id.*  The Supporting Creditors have agreed to provide bank guarantees and judicial guarantee insurance of up to R$1.5 billion to support the reorganized RJ Debtors business going forward.  *Id.*  The

---

[17]    The RJ Plan provides that technology supplier claims will receive in aggregate R$100 million of repayment, partner suppliers will receive in aggregate R$3.7 billion of repayment; supplier with unsecured claims above R$12,000 will receive a 48-month installment payments with a 50% discount of recovery.  *Id.* ¶ 17.

proposed recoveries that will be available to the creditors pursuant to the Americana Group's RJ plan is only made possible by the injection of new capital and conversion of debt to equity as provided under the RJ Plan, part of which is being provided by the Reference Shareholders. *Id.*

## JURISDICTION AND VENUE

38.    The district court has jurisdiction to hear bankruptcy matters under 28 U.S.C. § 1334. The district court has referred jurisdiction over this proceeding to this Court pursuant to 28 U.S.C. § 157 and the Amended Standing Order of Reference dated January 31, 2012, Reference M-431, *In re Standing Order of Reference Re: Title 11*, 12 Misc. 00032 (S.D.N.Y. Feb. 1, 2012) (Preska, C.J.). This is a core proceeding pursuant to 28 U.S.C. § 157(b). Venue is proper in this Court pursuant to 28 U.S.C. § 1410.

## OBJECTION

## I.    SABLON'S REQUEST GOES WELL BEYOND THE DISCOVERY PERMITTED IN CHAPTER 15 CASES

39.    Chapter 15 is an ancillary case limited to the territorial bounds of the United States that is commenced in support of a foreign insolvency proceeding. *In re JSC BTA Bank*, 434 B.R. 334, 341 (Bankr. S.D.N.Y. 2010) ("[T]he very definition of the word debtor when used in the chapter 15 context has an international perspective. The definition requires the Court to . . . recognize that the entity in question is already subject to the authority of a foreign court."); *see also In re Fairfield Sentry Ltd.*, 458 B.R. 665, 678–79 (S.D.N.Y. 2011) (explaining that chapter 15 cases are ancillary in nature, with jurisdictional limits over property within the recognizing country) (citing 8 Collier on Bankruptcy ¶ 1502.01). H.R. Rep. No. 109-31(I), at 106 (2005) ("Cases brought under chapter 15 are intended to be ancillary to cases brought in a debtor's home country . . . .").

40.     Although Rule 2004 is available in chapter 15 cases under certain limited circumstances, its application is much more restricted than in a plenary chapter 11 case.  Notably, Rule 2004 authorizes examination into "any matter which may affect the administration of the debtor's estate . . . ."  An "estate" refers to "the one created when a petition is filed under sections 301, 302, or 303 of the Bankruptcy Code."  *In re Glitnir Banki HF*, No. 08-14757 (SMB), 2011 WL 3652764, at *6 n.15 ("The filing of a chapter 15 petition does not create an 'estate.'"); *JSC BTA Bank,* 434 B.R. at 341 ("Chapter 15 cases are specialized proceedings unlike plenary cases commenced under the Bankruptcy Code.  Among the key differences, . . . commencement of a chapter 15 case does not create an "estate" as that term is used in the Bankruptcy Code.").  The nature and extent of a foreign debtor's assets is not at issue in a chapter 15, however, as there is no actual "restructuring" that takes place in a chapter 15 case.

41.     While Sablon insinuates that granting discovery to creditors is customary under Rule 2004, the majority of the cases it cites in support of the Motion are plenary cases, and ***none*** allowed creditors to use of Rule 2004 in chapter 15.  *See In re Serignese*, No. 19-10724 (JLG), 2019 WL 2366424 (Bankr. S.D.N.Y. June 3, 2019) (creditors' Rule 2004 request in a chapter 7 case); *In re Wilson*, No. 07-11862 (EWM), 2009 WL 304672 (Bankr. E.D. La. Feb. 6, 2009) (U.S. Trustee's Rule 2004 request in a chapter 13 case); *In re Hilsen*, No. 87-11261 (JMP), 2008 WL 2945996 (Bankr. S.D.N.Y. July 25, 2008) (debtor's former spouse's Rule 2004 request in a chapter 7 case); *In re Countrywide Home Loans, Inc*., 384 B.R. 373 (Bankr. W.D. Pa. 2008) (U.S. Trustee's Rule 2004 request in a chapter 13 case); *In re Metiom, Inc*., 318 B.R. 263 (Bankr. S.D.N.Y. 2004) (creditor trustee's Rule 2004 request in a chapter 11 case); *In re Enron Corp*., 281 B.R. 836 (Bankr. S.D.N.Y. 2002) (denying lead plaintiff's overly broad Rule 2004 request in a chapter 11 case as unrelated to any bankruptcy purpose); *In re Symington*, 209 B.R. 678 (Bankr. D. Md. 1997) (non-

party intervening news media's Rule 2004 request in a chapter 7 case); *In re Bennett Funding Grp.,*
*Inc.*, 203 B.R. 24 (Bankr. N.D.N.Y. 1996) (nondebtor third party's Rule 2004 request in a chapter

11 case); *In re Ionosphere Clubs, Inc.*, 156 B.R. 414 (Bankr. S.D.N.Y. 1993) (examiner's Rule

2004 request in a chapter 11 case); *In re Dinubilo*, 177 B.R. 932 (Bankr. E.D. Cal. 1993) (chapter

7 trustee's Rule 2004 request); *In re Drexel Burnham Lambert Grp., Inc.*, 123 B.R. 702 (Bankr.

S.D.N.Y. 1991) (debtor's Rule 2004 request in a chapter 11 case).

42.     The commencement of a chapter 15 case does not open a chapter 15 debtor up to

broad discovery over its financial condition or its assets located worldwide, and does not allow

creditors to impose chapter 11's discovery rules and procedures over the foreign debtor and

displace the legal system of the foreign main proceeding.  Rather, any parties seeking discovery

or other relief in connection to matters related to the debtor's plenary reorganization must direct

these requests to the foreign court consistent with governing legislation of the foreign proceeding.

Accordingly, Sablon's broad discovery requests are inappropriate, contravene the purpose of

chapter 15 and should be denied.

**A.     Creditors Are Not Permitted to Take Broad Rule 2004 Discovery in Chapter
15 Cases**

43.     The application of Rule 2004 in a chapter 15 is limited to discovery sought by a

foreign representative pursuant to the plain terms of the Bankruptcy Code.  The only provision of

chapter 15 specifically permitting discovery is Bankruptcy Code section 1521(a)(4), which affords

the foreign representative with the exclusive right to obtain discovery and examine witnesses:

20

> Upon recognition of a foreign proceeding, whether main or nonmain, where necessary to effectuate the purpose of this chapter and to protect the assets of the debtor or the interests of the creditors, the court may, ***at the request of the foreign representative***, grant any appropriate relief, including . . . (4) providing for the examination of witnesses, the taking of evidence or the delivery of information concerning the debtor's assets, affairs, rights, obligations or liabilities[.]

11 U.S.C. § 1521(a)(4) (emphasis added).  Bankruptcy courts are also authorized under Section 1507(a) "to provide additional assurance ***to a foreign representative***" if recognition is granted.  11 U.S.C. § 1507(a) (emphasis added).  Sablon cannot rely upon Bankruptcy Rule 2004 to independently expand the Court's limited jurisdiction in these Chapter 15 Cases.  The Bankruptcy Rules merely govern procedure and do not create substantive rights.  *See* 28 U.S.C. § 2075 ("Such [bankruptcy] rules shall not abridge, enlarge, or modify any substantive right.").

44.    The discovery contemplated by the Motion was not requested by the Foreign Representative under section 1521 or section 1507 and therefore is not permitted.  Indeed, courts have routinely denied similar discovery requests sought by parties other than the foreign representative in chapter 15 cases.  *See , e.g.,* June 5, 2013 Hr'g Tr. at 30:16–31:24, *In re A.B.C. Learning Centres Limited*, No. 10-11711 (KG) (Bankr. D. Del. June 12, 2013) [Docket No. 193] (denying Bankruptcy Rule 2004 motion filed by creditor because such relief was unavailable to the creditor under Bankruptcy Code section 1521(a)(4)); *see also Glitnir*, 2011 WL 3652764, at *6 (noting Section 1521(a)(4) expressly governs the ***foreign representative's*** discovery rights, and that rule 2004 complements those rights) (emphasis added); *In re Millennium Global Emerging Credit Master Fund Ltd.*, 471 B.R. 342 (Bankr. S.D.N.Y. 2012) (same).  Bankruptcy Code sections 1521 and 1507 govern the availability of discovery in chapter 15 cases, and Congress limited such

tools to scenarios where Bankruptcy Rule 2004 examinations were required for the foreign representative to carry out their duties.[18]

45.     The one case Sablon cites to support its broad requests, *Golden Sphinx Ltd.*, is an out-of-circuit decision in which the court only indicated in *dicta* that in limited circumstances Rule 2004 discovery in chapter 15 cases might be available to creditors.  2023 WL 2823391, at *3 (noting that "[t]his Court *might be persuaded* to authorize limited discovery relevant to [the issue of a fraudulent transfer that the foreign representatives were wrongly refusing to pursue]" if there were no other adversarial proceeding that would lead to such discovery (emphasis added)).  Indeed, Judge Bason ultimately denied the Rule 2004 motion in *Golden Sphinx* as a "fishing expedition," finding it was inappropriate regardless due to the pending non-bankruptcy litigation and the overly broad scope of the discovery request.  *Id.* at *3–*4.

46.     Even applying the *dicta* in *Golden Sphinx*, Sablon still would not be entitled to the broad Rule 2004 discovery it seeks.  Judge Bason suggested that "limited discovery" by a creditor might be possible "if it were relevant to a pending contested matter involving the elements of the chapter 15 petition" or in defense of a motion or adversary proceeding brought by the foreign representatives.  *Id.* at *3.  Neither of those circumstances are present here.  Judge Bason also theorized that in a *non*-adversarial context a court could grant a creditor's Rule 2004 motion "if it would further this Court's assistance of the foreign main proceeding," such as where potential fraud is uninvestigated.  *Id.*  However, no such assistance is needed.  The discovery Sablon wants

---

[18]    Nor does Bankruptcy Code section 105 provide any basis for Rule 2004 discovery in chapter 15 cases.  Bankruptcy Code section 105 cannot be used as a "gap filler" under these circumstances to expand rights Sablon does not have.  *See, e.g., In re MF Global Holdings Ltd.*, 465 B.R. 736, 741 (Bankr. S.D.N.Y. 2012) ("[S]ection 105(a) limits the bankruptcy court's equitable powers, 'which must and can only be exercised within the confines of the Bankruptcy Code.'"); *In re LightSquared Inc.*, 504 B.R. 321 (Bankr. S.D.N.Y. 2013) ("[Section 105] does not, however, give a bankruptcy court *carte blanche* to do whatever is deemed to be equitable, particularly by creating remedies that extend the substantive reach of the statute.") (emphasis in the original).

already has been pursued on multiple fronts in Brazil, including by: (1) a committee established by Americanas' board of directors to investigate the fraud; (2) three Brazilian governmental bodies, (3) the RJ Court; and (4) certain of Americanas' creditors, who "are taking independent actions to investigate the Fraud." Mot. ¶¶ 27, 31–32.

47.    Accordingly, the Motion should be denied in its entirety because this type of general discovery regarding the Chapter 15 Debtors and its assets is simply not available to creditors under Rule 2004 in a chapter 15 case.

**B.    The Requested Discovery Would Not Advance Any Legitimate Chapter 15 Purpose**

48.    The broad discovery sought by Sablon also would not further the limited purposes of these Chapter 15 Cases, which are designed to assist a foreign representative in the administration of the foreign estate.  *In re Platinum Partners Value Arbitrage Fund L.P.*, 583 B.R. 803, 810 (Bankr. S.D.N.Y. 2018); *Krys v. Paul, Weiss, Rifkind, Wharton & Garrison, LLP (In re China Med. Techs., Inc.)*, 539 B.R. 643, 649 (S.D.N.Y. 2015).  A chapter 15 court's most basic objective "is to foster the orderly administration of cross-border restructurings."  *In re JSC BTA Bank*, 434 B.R 334, 340 (Bankr. S.D.N.Y. 2010).

49.    Here, Sablon's broad request for Rule 2004 discovery would undermine the orderly administration of the foreign estate.  Granting the Motion would complicate the administration of the Brazilian RJ Proceeding by opening a collateral proceeding in the United States that would increase litigation rather than focusing it in Brazil.[19]  *See In re Golden Sphinx*, No. 22-14320 (NWB), 2023 WL 2823391, at *3 (Bankr. C.D. Cal. Mar. 31, 2023) (holding that granting the creditor's Rule 2004 motion "fishing expedition" would contradict the "whole point of Chapter

---

[19]    Sablon has not sought discovery in Brazil, either through the Brazilian RJ Proceeding or otherwise.  Foreign Representative Decl. ¶ 39.

15," which is "to avoid a multiplicity of international proceedings."). In fact, the requested discovery could even harm Americanas by potentially prejudicing claims Americanas may assert on behalf of all stakeholders against third parties such as the prior management and auditors. The Reference Shareholders have already agreed to provide a substantial portion of the new capital under the RJ Plan which will allow the Americanas Group to resume its activities and maximize the recoveries of its creditors. This critical infusion of new capital could also be put at jeopardy if Sablon is permitted to interfere with the Brazilian RJ Proceeding.

50. Indeed, Sablon's express purpose for obtaining Rule 2004 discovery prior to the AGC is to interfere with the RJ Plan process by disclosing "to other creditors that there exists an alternative method for obtaining information that Sablon believes should be considered before votes are cast." November 30 Letter at 2. The fact that Sablon has apparently not even taken the necessary steps to ensure it is allowed to participate in the AGCs to vote on the RJ Plan (Foreign Representative Decl. ¶ 35; Brazilian Law Decl. ¶ 11), further demonstrates that Sablon is more interested in disrupting the restructuring efforts of the Americanas Group in its Brazilian RJ Proceeding than in actually participating in the Brazilian Proceedings or recovering on its claim under the JSM Global Notes.

51. Furthermore, it would be inappropriate to allow Sablon use Rule 2004 in these Chapter 15 Cases to circumvent or supplant the Brazilian RJ Proceeding. The Americanas Group's restructuring is occurring in Brazil, not in the Southern District of New York. To the extent Sablon seeks discovery related to potential claims in Brazil against Brazilian persons, the appropriate forum is the applicable Brazilian courts. *See* June 4, 2015 Hr'g Tr. at 7:10–12, 23:16–23, *In re OAS Fin. Ltd.*, No. 15-11304 (SMB) (Bankr. S.D.N.Y. June 23, 2015) [Docket No. 43] ("I'm just questioning why this dispute is here as opposed to as in Brazil because you want documents for

the Brazilian proceeding. . . . [R]eally the bottom line is that this information is in Brazil . . . and it concerns a Brazil proceeding. . . .").

## II.    SABLON LACKS STANDING TO SEEK DISCOVERY OR BRING CLAIMS AGAINST THE CHAPTER 15 DEBTORS

52.    Additionally, Sablon lacks standing to prosecute the Motion or the potential claims it hopes to assert using discovery.  Under the JSM Indenture, Sablon bargained away its right to unilaterally initiate a legal proceeding (including the Motion) related to the JSM Notes and thus, lacks standing to even seek Rule 2004 discovery.  The indenture for the JSM Global Notes contains a no-action clause, which provides, in relevant part, that "[a] Holder **may not institute any proceeding, judicial or otherwise, with respect to this Indenture or the Notes**" unless certain conditions are met.  *See supra* ¶ 17 (emphasis added).  While Sablon retains the right to seek recoupment of the principle and interest owed to it,[20] the No-Action Clause otherwise requires, among other things, specific notice to the Indenture Trustee and a request made by at least 25% of the relevant holders of the JSM Global Notes before initiating any proceeding with respect to the notes.   Here, Sablon initiated this proceeding by filing the Motion (which does not seek repayment), but there is no evidence that Sablon or the requisite number of Noteholders first requested that the Indenture Trustee take action as required in Section 6.06(i)–(iii).

53.    Courts in this circuit have routinely enforced contractual restriction on creditor enforcement rights, including with respect to proceedings in bankruptcy cases.  *See, e.g.*, *Penades v. Republic of Ecuador*, 2016 WL 5793412, *3-5 (S.D.N.Y. 2016) (dismissing bondholder's claim to enforce an indenture for failure to comply with conditions precedent in a no-action clause);

---

[20]    Section 6.07 of the JSM Indenture also grants noteholders an "unconditional right" to receive payment of or to sue for failure to pay principal and interest on its JSM Notes on or after the stated maturity, which right may not be amended without the consent of the relevant Noteholders. But Sablon is not seeking to enforce its contractual right to receive payment on the notes or enforce such payment with the Motion.

*Chatham Capital Holdings, Inc. v. Conru*, 2023 WL 22622, *3-4 (S.D.N.Y. 2023) (finding that an indenture's no-action clause bars claims regarding the indenture or the securities brought by a minority securityholder absent the satisfaction of certain conditions precedent); *In re Ion Media Networks, Inc.*, 419 B.R. 585, 595–96 (Bankr. S.D.N.Y. 2009) (holding that a creditor lacked standing to bring its claim based upon a second lien indenture because the conditions precedent in the indenture's no-action clause were unsatisfied). Rule 2004 applications like the Motion, are judicial proceedings, [21] and thus, subject to the No-Action Clause in this circuit.

54.     Similarly, one of Sablon's stated purposes for the discovery is to support avoidance and fraud actions related to the notes, all of which also would be barred by the No-Action Clause of the JSM Indenture. *See Feldbaum v. McCrory Corp.*, No. 11866 (LA), 1992 WL 119095 at *8 (Del. Ch. Ct. June 2, 1992) (reasoning that fraudulent conveyance claims brought by an individual security fall within the scope of the indenture's no-action clause); *Lange v. Citibank, N.A.*, No. 19245 (LES), 2002 WL 2005728, at *7 (Del. Ch. Ct. Aug. 13, 2002) (same); *Akanthos Cap. Mgmt., LLC v. CompuCredit Holdings Corp.*, 677 F.3d 1286, 1292-95 (11th Cir. 2012) (same). Accordingly, this Court should deny the Motion based upon Sablon's lack of standing to both seek Rule 2004 discovery and to bring the further claims "with respect to the Indenture or Notes" that Sablon identifies.

### III.     THE MOTION IS AN ABUSE OF RULE 2004 AGAINST THE CHAPTER 15 DEBTORS

55.     The Motion also should be denied as an abuse of Rule 2004 because it is intended to harass the Chapter 15 Debtors and their shareholders, as Sablon could obtain the discovery in

---

[21]     *See, e.g.*, *In re China Med. Techs., Inc.*, 539 B.R. at 648 (comparing a "Rule 2004 proceeding" to an adversarial proceeding under the Bankruptcy Code in determining that federal common law should apply in a Rule 2004 proceeding whereas state-law rules of decision should apply in other adversary proceedings under the Bankruptcy Code).

Brazil and seeks to use the information outside the Chapter 15 Cases. *See In re Cambridge Analytica LLC*, 600 B.R. 750, 752 (Bankr. S.D.N.Y. 2019) (citing *In re Mittco, Inc.*, 44 B.R. 35, 36 (Bankr. W.D. Wis. 1984)) ("Courts … impose[] limits on the use of Rule 2004 examinations where the purpose of the examination is to abuse or harass."). The use of Rule 2004 constitutes harassment when, as here, the movant previously had an opportunity to "explore the issues raised" by the Rule 2004 motion but did not do so. *Martin v. Schaap Moving Sys.*, No. 97-5042 (PNL), 1998 U.S. App. LEXIS 15255, at *7–8 (2d. Cir. April 21, 1998) (citing *Mittco*, 44. B.R. at 36).

56.    First, Sablon admits it could have sought the requested information in Brazil, but attempts to convince this Court that "[t]he discovery [sought] here is not available in Brazil because of . . . the discovery limitations under Brazil's rules of civil procedure." Motion ¶ 39. But that is not true. Creditors may—as even Sablon concedes—seek discovery through separate legal actions before a Brazilian court. Mot. ¶ 42; Brazilian Law Decl. ¶¶ 19–32. Indeed, on January 23, 2023, Bradesco, Americanas' largest bank lender, sought discovery under the relevant Brazilian discovery procedures from Americanas related to the accounting inconsistencies which are the subject of the current Motion. Foreign Representative Decl. ¶¶ 22, 23. The Brazilian court approved such request and appointed Kroll Associates as the expert tasked with gathering the evidence. *Id.* ¶ 30. Similarly, on January 24, 2023, Banco Santander, another bank lender holding R$3.5 billion, requested and was granted access to information from Americanas under the relevant Brazilian discovery procedures. *Id.* ¶ 30.[22] Thus, Sablon's sweeping assertions that discovery limitations under Brazil's rules of civil procedure and the novelty of Brazilian discovery

---

[22]    Caixa Econômica, another creditor holding R$500 million, requested and was granted discovery under relevant Brazilian discovery procedures. *Id.* Americanas filed an appeal against the Brazilian court's decision, which resulted in an injunction of the order granting the discovery. *Id.*

prevent or otherwise "impose significant challenges" to seeking the requested information in Brazil (Mot. ¶¶ 39,42) are categorically false.

57.     Sablon's contention that Brazilian courts would not have jurisdiction or lack authority to order parties located outside Brazil to produce discovery is also incorrect.  Mot. ¶¶ 39-40.  As seen by the discovery that has already been sought and ordered against the Americanas Group, they are subject to discovery in the Brazilian courts.  Brazilian courts can also issue letters rogatory to obtain discovery from parties located outside Brazil.  Brazilian Law Decl. ¶ 28.  Sablon suggests that the letter rogatory process would be time consuming, but Sablon has been on notice of the accounting inconsistencies at issue since January of this year, almost eleven months ago. Any complaints about delays associated with seeking letters rogatory are baseless when such delay is a product of Sablon's own making.

58.     Second, Sablon cannot use the Motion to obtain discovery to support its purported legal claims in Brazil outside of the chapter 15 cases.  Courts have recognized that Rule 2004 is abused "where the party requesting the Rule 2004 examination is to benefit in pending litigation outside of Bankruptcy Court." *Cambridge Analytica*, 600 B.R. at 752.  *See also In re Enron Corp.*, 281 B.R. 836, 842 (Bankr. S.D.N.Y. 2002) (finding harassment where Bankruptcy Rule 2004 discovery would benefit the movant's litigation outside bankruptcy court); *Snyder v. Society Bank*, 181 B.R. 40, 42 (S.D. Tex. 1984), *aff'd sub nom. In re Snyder*, 52 F.3d 1067 (5th Cir. 1995) (denying Bankruptcy Rule 2004 discovery where the motivation was to use the discovery for a state court proceeding).  This is particularly applicable here, where Sablon is seeking the proposed discovery to support claims that would be asserted in other Brazilian Courts – not even in the Brazilian RJ Proceeding or for purposes related to the Chapter 15 Debtors' restructuring.

IV.    **SABLON CANNOT DEMONSTRATE "GOOD CAUSE" TO SUPPORT A RULE 2004 EXAMINATION**

59.    Sablon has also failed to meet the applicable standards for obtaining Rule 2004 discovery against the Chapter 15 Debtors and the Reference Shareholders. The party seeking Rule 2004 discovery has the burden to show "good cause" for the examination it seeks, and relief lies within the sound discretion of the court. *In re SunEdison, Inc.*, 562 B.R. 243, 249 (Bankr. S.D.N.Y. 2017) (citing *In re Bernard L. Madoff Inv. Secs. LLC*, No. 08-01789 (SMB), 2014 Bankr. LEXIS 4603, at *7 (Bankr. S.D.N.Y. Oct. 30, 2014)); *In re Bd. of Dirs. of Hopewell Int'l Ins. Ltd.*, 258 B.R. 580, 587 (Bankr. S.D.N.Y. 2001) (court has "significant discretion" in adjudicating a Rule 2004 request). A party seeking to conduct a Rule 2004 examination typically shows good cause by establishing that the proposed examination "is necessary to establish the claim of the party seeking the examination, or . . . denial of such request would cause the examiner undue hardship or injustice.'" *SunEdison*, 562 B.R. at 249 (quoting *In re Metiom, Inc.*, 318 B.R. 263, 268 (S.D.N.Y. 2004)). None the arguments raised by Sablon satisfy its burden.

A.    **Dissatisfaction with the Brazilian Discovery Process Does Not Establish "Good Cause" for Sablon's Rule 2004 Request**

60.    Sablon's assertions regarding a purported lack of "success" in the Brazilian investigations and the discovery limitations in Brazil do not establish a basis for Rule 2004 discovery. Mot. ¶¶ 27–42. As previously stated, various parties, including other creditors, have initiated investigations and sought information in Brazil regarding the exact issues for which Sablon now seeks discovery. Sablon has the same opportunity to utilize the same mechanisms and procedures that were afforded to these other parties to obtain the information and documents related to the accounting inconsistencies. *See supra* ¶ 30. Under these circumstances, there can be no good cause for Sablon's separate, collateral Rule 2004 discovery. *See SunEdison*, 562 B.R.

at 249 (proposed examination must be "necessary to establish the claim . . . or . . . denial of such request would cause the examiner undue hardship or injustice.") (quoting *In re Metiom, Inc.*, 318 B.R. at 268).

61.     Sablon's assertion that the discovery would be admissible in Brazilian legal proceedings under 28 U.S.C. § 1782 is irrelevant.  But Section 1782 is inapplicable here.  Section 1782 provides that the "district court of the district in which a person resides or is found may order him . . . to produce a document or other thing for use in a foreign proceeding in a foreign or international tribunal[.]" 28 U.S.C. § 1782.  First, this Court is not a district court.[23]  Second, none of the targets of Sablon's discovery request reside in New York,[24]  as the Chapter 15 Debtors are Brazilian, the LTS companies and Cedar Trade LLC are registered in the state of Delaware.  Mot. ¶ 35I–(d).

62.     Even if it were applicable, Sablon cannot satisfy all of the four discretionary *Intel* factors that courts consider in adjudicating a Section 1782 request: (1) whether the person from whom the discovery is sought is a participant in the foreign proceeding; (2) the nature of the foreign tribunal, the character of the proceedings underway abroad, and the receptivity of the foreign government or the court or agency abroad to U.S. federal-court judicial assistance; (3) whether the Section 1782 request conceals an attempt to circumvent foreign proof-gathering restrictions or other policies of a foreign country or the United States; and (4) whether the Section 1782

---

[23]     *See Hopewell*, 258 B.R. at 586–87 (abstaining from applying Section 1782 when the applicant presented its motion only under Rule 2004, determining that the application of Section 1782 was not an issue despite suggesting the "existence of possible recourse under Bermuda law and under [Section] 1782"); *Glitnir*, 2011 WL 3652764, at *4 n.10 ("[B]oth sides discussed whether the discovery was available under 28 U.S.C. § 1782(a), which authorizes the *district court* to order discovery in connection with foreign proceedings. . . .  The Court questioned its authority to permit discovery under the provision, and instead, granted the *Discovery Motion* relying on 11 U.S.C. § 1521(a)(4) and Rule 2004.") (emphasis in original).

[24]     A district court has jurisdiction to grant a discovery application only if "the person from whom discovery is sought resides or is found within the district."  *Kiobel by Samkalden v. Cravanth, Swaine & Moore, LLP*, 895 F.3d 238, 243 (2d Cir. 2018) (cleaned up)

application contains unduly intrusive or burdensome discovery requests.  *Intel Corp. v. Advanced Micro Devices, Inc.*, 542 U.S. 241, 264–65 (2004).  In particular, given the obvious availability of discovery in Brazil, the Motion is clearly an "attempt to circumvent foreign proof-gathering restrictions or other policies of a foreign country or the United States."  *Intel*, 542 U.S. at 264–65.  Further, the requested discovery is unduly intrusive and overly burdensome on the Chapter 15 Debtors (as explained above).

**B.      The Burdens of the Rule 2004 Examination Vastly Outweigh Any Purported Benefits**

63.      In evaluating a Rule 2004 request, the court must "balance the competing interests of the parties, weighing the relevance of and necessity of the information sought by examination."  *In re AOG Entm't, Inc.*, 558 B.R. 98, 109 (Bankr. S.D.N.Y. 2016) (quoting *Drexel Burnham*, 123 B.R. at 712).  Ultimately, the discovery request must be "proportional to the needs of the case, considering the importance of the issues at stake in the action, the amount in controversy, the parties' relative access to relevant information, the parties' resources, the importance of the discovery in resolving the issues, and whether the burden or expense of the proposed discovery outweighs its likely benefit."  *SunEdison*, 562 B.R. at 250.

64.      To satisfy Sablon's broad discovery request would require an immense amount of time and effort on the part of the Chapter 15 Debtors, their employees and professionals.  The work would be disruptive and undoubtedly interfere with the RJ Proceeding by distracting key people from the AGC at a critical juncture of the Brazilian RJ Proceeding, redirecting valuable resources meant for creditor recoveries to the payment of professional fees, and potentially prejudicing claims Americanas might later assert on behalf of all stakeholders.  Foreign Representative Decl. ¶ 38.

31

65. These burdens are not proportional to the questionable benefits of such discovery to the movant. Sablon allegedly holds only US$1 million of the US$1 billion of senior unsecured notes issued by JSM Global. Nigri Decl. ¶¶ 6–9. As currently contemplated under the RJ Plan, Sablon is expected recover, for each R$100 it holds, between (i) approximately R$0.42 in equity capitalization, R$.07 in new debt on the market, R$0.24 in cash repurchase, R$0.28 in discount (Option 2 of the RJ Plan), and (ii) 20% (the default recovery under the RJ Plan) on its claim. Foreign Representative Decl. ¶ 37. The professional fees and costs alone associated with satisfying Sablon's discovery request likely would exceed both Sablon's maximum claim value and expected recovery under the RJ Plan. *Id.* ¶ 38. Further given the No-Action Clause in the JSM Indenture, it is unlikely that Sablon would even be permitted to assert the potential claims to which it alludes in its Motion. At most, Sablon may (as previously noted) try to use any discovery obtained to derail the Chapter 15 Debtors' RJ Plan. Nor would the discovery likely benefit any other creditors. Other creditors already have accessed the Brazilian courts (and continue to do so) to obtain this information—*i.e.*, in the proper forum—and are participating in the Brazilian RJ Proceedings. Tellingly, no other creditor, not even the indenture trustee, has joined Sablon in its Motion.

66. The requested discovery will not "complement discovery efforts in Brazil" (Mot. ¶¶ 32, 35). The information and topics Sablon seeks (*see* Mot. ¶ 35) have already been investigated in Brazil and have been subject of other creditors' discovery efforts in Brazil. *See* Foreign Representative Decl. ¶¶ 24–35. Thus, the requested discovery would be duplicative. *See id.* Nor has Sablon cited a single case finding that a creditor's Rule 2004 discovery efforts were appropriate to "complement" discovery efforts in a foreign main proceeding. Courts have concluded the opposite. For example, this Court in *SunEdison* denied a Rule 2004 motion for "additional discovery [that] does not appear to be necessary to resolve any material issues" where substantial

32

discovery had already been produced and the "cost of retrieving, reviewing and producing . . . may exceed [the applicant's] distribution in the [d]ebtors' cases, and some of the requests could be made of every creditor and equity interest holder in these cases." *SunEdison*, 562 B.R. at 250.

### C.    Sablon's Request Amounts to an Impermissible Fishing Expedition

67.    As previously noted, Sablon's request amounts to an impermissible and collateral "fishing expedition." *See Glitnir*, 2011 WL 3652764, at *6 n.15 ("[T]his Court has observed that [section] 1521(a)(4) may not authorize the 'fishing expeditions' associated with Rule 2004."). Indeed, Sablon's request would not even be permitted in the chapter 11 context, where the scope of Rule 2004 examination is broad, but "not limitless." *SunEdison*, 562 B.R. at 249 (quoting *In re Fearn*, 96 B.R. 135, 138 (Bankr. S.D. Ohio 1989)). Sablon broadly seeks from a Brazilian debtor, among other things, *all* communications and documents "reflecting *every* payment of dividends" spanning the past ten years and those related to financial statements, "including but not limited to internal and external audit reports and their working papers," regarding conduct that happened in Brazil involving Brazilian entities. Mot. Exs. B, C. Such an expansive scope for communications and documents cannot be reconciled with the fact that Sablon does not assert *any* claims even in Brazil against the Chapter 15 Debtors and their property, the Reference Shareholders, or any other related parties that would be related to their discovery requests.[25] The request is particularly inappropriate where there is no estate being administered by this Court.

### CONCLUSION

68.    Based on the foregoing, the Foreign Representative respectfully requests that the Court deny the Motion.

---

[25]    As explained in Section III.B above, even if such discovery were related to the Chapter 15 Debtors' potential claims against shareholders, Sablon's claim as an unsecured creditor is dwarfed by the sheer magnitude of the request.

Dated:  December 5, 2023

New York, New York

Respectfully submitted,

WHITE & CASE LLP

By:    */s John K. Cunningham*
        John K. Cunningham


WHITE & CASE LLP
1221 Avenue of the Americas
New York, New York 10020-1095
(212) 819-8200
John K. Cunningham
Gregory M. Starner
Ricardo M. Pasianotto (admitted *pro hac vice*)
jcunningham@whitecase.com
gstarner@whitecase.com
ricardo.pasianotto@whitecase.com

Southeast Financial Center
200 South Biscayne Blvd., Suite 4900
Miami, Florida 33131
(305) 371-2700
Richard S. Kebrdle (admitted *pro hac vice*)
rkebrdle@whitecase.com

*Attorneys for Antonio Reinaldo Rabelo Filho,*
*as Petitioner and Foreign Representative*